## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### No. __:___-CV-___-__

CHARLES HALLINAN, JOSEAN )
KINARD, GEORGE RIDDICK, JORGE L. )
MALDONADO, WILLIAM BROWN, )
TERRANCE FREEMAN, ANTHONY )
BUTLER, DARYL WILLIAMS, )
QUAMAIN JACKSON, AND LASALLE )
WALDRIP, on behalf of themselves and )
similarly situated individuals, )
                                    )
     *Plaintiffs/Petitioners,*   )
                                      )
v. )
                                        )
THOMAS SCARANTINO, Complex )
Warden, Federal Correctional Complex )
Butner; MICHAEL CARVAJAL, Federal )
Bureau of Prisons Director; and JEFFERY )
ALLEN, Federal Bureau of Prisons Medical )
Director, in their official capacities, and the )
FEDERAL BUREAU OF PRISONS, )
                                      )
     *Defendants/Respondents.*   )

**Class Action Complaint for Injunctive
and Declaratory Relief and Petition for
Writ of Habeas Corpus**

**Class Action**

### INTRODUCTION

1.    A crisis at Federal Correctional Complex Butner ("Butner") continues to threaten the lives,

health, and safety of incarcerated people and staff because Defendants have not taken

adequate measures to control the spread of the virus that causes COVID-19. Although the

risk of COVID-19 is generally higher in facilities where people reside in close quarters, the

risk is especially acute at Butner, which is home to a federal medical facility and,

consequently, a large number of elderly and medically vulnerable people who face a

heightened risk of suffering severe illness and/or death from COVID-19.

2. The Bureau of Prisons ("BOP") has the power to undertake measures that will protect prisoners from harm, including implementing appropriate practices for both prisoners and staff such as testing, contact tracing, quarantine, isolation, physical distancing, cleaning, provision of personal protective equipment, medical care, and release to home confinement or compassionate release. In a prior lawsuit, the BOP admitted to having such authority, yet it has taken grossly insufficient measures at Butner. Defendants' deliberate indifference to the risks faced by the men in their custody, despite knowledge of the harm and what it would take to correct it, violates the Eighth Amendment.

3. Defendants' failure to take sufficient measures to address the crisis violates the rights of people with disabilities who are entitled to a reasonable accommodation under the Rehabilitation Act of 1973 ("Rehab Act"). Defendants must ensure that persons with disabilities incarcerated at Butner have the opportunity to benefit from Butner's programs, services, and activities on an equal basis as those without disabilities. They have not done so.

4. Defendants' failure to take sufficient measures to address the crisis is a method of administration of Butner that disparately impacts people incarcerated there who have a disability. The failure to mitigate the risks from COVID-19 more harshly affects persons with disabilities than persons without disabilities.

5. Seven months after the first documented case of SARS-nCoV-2 ("coronavirus" or "virus")[1] at Butner, the virus has spread widely through Butner's population, endangering thousands of lives.[2] More than a quarter of the people incarcerated at Butner, and more than 50 staff

---

[1]  SARS-nCoV-2 causes the disease COVID-19.
[2]  *See* BOP Press Release, *Inmate Death and FCI Butner I*, https://www.bop.gov/resources/ news/pdfs/20200412_press_release_inmate _death_but_covid19.pdf (April 12, 2020).

members, have been infected so far.  **Twenty-six people at Butner, including one correctional officer, have died from COVID-19**.  This figure represents more than twice as many deaths as at any other BOP facility and **one-fifth** of all the deaths in BOP facilities nationally.  Each of the deceased Butner residents was medically vulnerable and had a disability under federal law.  And at least one contracted the virus a second time, more than two months after first contracting it and then testing negative.[3]

6.   People at Butner are packed into crowded dormitories, small cells, and narrow hallways.  They cannot physically distance themselves from others or self-quarantine.  They cannot ensure that *others* are effectively quarantined from them if they are infected.  Instead, they must sleep within a few feet of one another, use communal bathroom facilities, and line up close together several times a day for food and medicine.

7.   Butner's health care "system" is grossly inadequate to treat sick men in its custody, and specifically those with disabilities, including pre-existing medical conditions that make them especially vulnerable to COVID-19.  The BOP has inadequate infection surveillance, testing, quarantine, and isolation practices at Butner.  What is more, due to the BOP's bungled response to the COVID-19 pandemic at Butner, many people with serious medical conditions unrelated to COVID-19 have not received necessary treatment.

8.   The BOP knows of the conditions at Butner, the extreme threat they pose, and the necessary measures that must be implemented to protect elderly and otherwise medically vulnerable

---

[3]   *See* Press Release, *Inmate Death at FCI Butner (Low)*, U.S. Dep't of Justice Federal Bureau of Prisons (Sept. 17, 2020), https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf ("On Monday, June 1, 2020, inmate Ricky Lynn Miller tested positive for COVID-19.  On Monday, July 6, 2020, Mr. Miller tested negative for COVID-19 . . . . On Wednesday, September 16, 2020, Mr. Miller tested positive for COVID-19 at the outside hospital.")

and disabled prisoners incarcerated there. Yet Defendants have failed to take critical steps to address the crisis.

9. This action seeks injunctive relief to protect the people in BOP custody at Butner, including medically vulnerable people and people with disabilities who, because of their medical conditions and/or advanced age, are at higher risk of severe injury or death from COVID-19. Named Plaintiffs Charles Hallinan, Josean Kinard, George Riddick, Jorge L. Maldonado, William Brown, Terrance Freeman, Anthony Butler, Daryl Williams, Quamain Jackson, and Lasalle Waldrip seek to represent a class of all persons currently or in the future incarcerated at Butner while anyone on the premises is infected with COVID-19 (the "Class"). Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip seek to represent a subclass of current and future people incarcerated at Butner who are medically vulnerable and at high risk of severe illness or death from COVID-19 due to disabilities protected under Section 504 of the Rehabilitation Act, including those with the following conditions: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") or moderate to severe asthma; immunocompromised state from solid organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other immune weakening medicines; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; diabetes; cerebrovascular disease; cystic fibrosis; hypertension; neurologic conditions such as dementia; liver disease; pulmonary fibrosis; and thalassemia (the "Disability Subclass").

10. COVID-19 is a highly contagious and deadly pandemic that raced across the globe, fundamentally altering life for everyone. There is no cure and no vaccine.

11. With more than 40 million known infections worldwide and more than 1.1 million people dead, the number of people affected by COVID-19 is staggering.[4] In the United States, more than 8.1 million people have tested positive for the virus, and more than 210,000 have died. Our country's prisons have been especially hard-hit: almost **150,000** incarcerated people and more than 32,000 staff have tested positive, with at least 1,245 deaths among incarcerated people and 86 deaths among staff.[5]

12. Testing for COVID-19 at Butner is irregular, inconsistent, and relatively limited. The BOP has not tested all the men incarcerated there. The true number of infected people at Butner is unknown.

13. Under even the best of circumstances, with people following rigorous physical distancing and good hygiene practices, our society can only hope to limit the spread of coronavirus and "flatten the curve" to keep from overwhelming hospital resources and allow a better chance of survival for those with serious symptoms. But in Butner, where physical distancing and good hygiene practices are impossible, the circumstances are much worse.

14. Crowded spaces make the situation more dire. Butner is operating at more than 99 percent of its capacity, making it impossible for the men incarcerated there to physically distance themselves from one another.

15. Butner houses many of the most medically vulnerable people in BOP custody. It includes a large Federal Medical Center ("the FMC" or "FMC Butner"), where those needing the most intensive medical care provided by the BOP are placed. Butner also has a large low-security

---

[4]  *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins*, Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited Oct. 19, 2020).

[5]  The Marshall Project, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited Oct. 19, 2020).

prison that houses hundreds of men with serious medical conditions. Others housed in other parts of the complex also have serious medical conditions.

16. Defendants/Respondents Director Carvajal, Warden Scarantino, and Medical Director Allen (hereinafter, "Individual Defendants") have shown deliberate indifference to the severe and obvious risk of illness and death that COVID-19 poses to people incarcerated at Butner. Their actions violate the U.S. Constitution's Eighth Amendment prohibition against cruel and unusual punishment. In addition, Defendant BOP has failed to make reasonable modifications to Butner's policies, practices, and procedures to allow individuals with disabilities incarcerated at Butner to enjoy the full benefits of its programs, services, and activities, including food, medicine and medical care, housing, communications, and recreation.

17. The Individual Defendants and BOP (collectively, "Defendants") have failed to take the necessary steps to address the severe risks faced by the Class. Despite direction from the U.S. Attorney General months ago to expeditiously consider medically vulnerable people for home confinement or other release, Defendants continue to oppose motions for compassionate release made by medically vulnerable people, and they have failed to order furloughs or transfers to home confinement with sufficient speed and in sufficient numbers. They have also failed to make other arrangements within the facility to allow for adequate physical distancing, in particular for people who are more vulnerable due to age, medical condition, or disability.[6] And they have failed to implement effective isolation, quarantine, testing, screening, hygiene, and disinfecting policies or meaningfully modify movement

---

[6] Beyrer Decl. at 8–12.

protocols for staff and incarcerated people, thereby increasing the risk that people incarcerated at Butner will contract COVID-19 and suffer serious illness or death.[7]

18.   Defendants' failures not only endanger people incarcerated at Butner, they put Butner's staff, local health care workers, family members, and the broader community at extreme risk.[8]

19.   Without the ability to physically distance from one another, medically vulnerable people incarcerated at Butner remain at extraordinary risk of infection, serious illness, and death from COVID-19.[9]  At current population levels, people incarcerated at Butner cannot practice meaningful physical distancing and are at continuing, increased risk of serious illness and death.

20.   These conditions are well-known to Defendants, as are the steps they must take to accommodate prisoners with disabilities and prevent constitutional violations.  They must act quickly to prevent the further spread of COVID-19 at Butner.  The only effective option—and reasonable accommodation—is to immediately release Butner residents based on defined categories, including but not limited to those who are medically vulnerable, and to develop and implement a plan that provides for (1) adequate physical distancing; (2) consistent and effective testing, quarantining, and medical isolation; and (3) consistent and effective cleaning and disinfecting practices.[10]

---

[7]   *See, e.g.*, Beyrer Decl. 13–25.

[8]   *See, e.g.*, Beyrer Decl. at 10–11, 26.

[9]   *See, e.g.*, Beyrer Decl. at 8–14.

[10]   *See, e.g.*, Beyrer Decl. at 32–33.  The term "release," as used throughout this Complaint/Petition, refers to discharge of incarcerated persons from the physical confines of Butner, not necessarily release from custody.  Release options may include, but are not limited to: enlargement of custody, release to parole or community supervision; transfer furlough (as to another medical facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to Butner once the pandemic is over and the viral health threat is abated.  Any releases would include requirements for testing, care, and physical distancing, as informed by a public health expert.  Incarcerated people should not be sent to another dangerous and crowded BOP facility to address the concerns at Butner.

21. In connection with a prior suit, the Individual Defendants asserted on June 3, 2020—when 15 people had died at Butner—that "FCC Butner's efforts have been effective in managing infections and treating inmates."[11]

22. Within a week after the Individual Defendants asserted the effectiveness of their efforts, the reported number of positive COVID-19 tests for people incarcerated at Butner climbed from 654 to 928.[12] Within a month, another ten people were dead, including John Dailey, one of that lawsuit's petitioners.[13] Although the reported infection rates at Butner have declined since then, the risk of another deadly surge remains—particularly given that the number of confirmed infections in North Carolina is again rising. Without action by this Court, more people at Butner will become infected and more people will die.[14]

### JURISDICTION AND VENUE

23. Plaintiffs/Petitioners (hereinafter, "Plaintiffs") bring this class action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 2241 (habeas corpus) for relief from detention that violates their Eighth Amendment rights under the U.S. Constitution, and pursuant to 29 U.S.C. § 794 for relief from disability discrimination.[15]

---

[11] Ex. 1 (Opp. to Emergency Mtn for TRO, PI, and Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 5:20-HC-2088-FL (E.D.N.C. June 3, 2020), ECF No. 42, at 3).

[12] Ex. 2 (June 3, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page); *see also* Ex. 3 (June 10, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page). These numbers include all incarcerated persons who have tested positive, including those who have recovered and those who died.

[13] Ex. 4 (July 6, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page); *see also* Ex. 5 (BOP Press Release regarding the death of John Dailey).

[14] *Compare* Mem. of Law in Supp. of Resp'ts' Mot. to Dismiss, or in the Alternative, Mot. for Summ. J., *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 35 ("Conditions at FCC Butner are far less dire than Petitioners' often generic and sensationalized allegations suggest.") *with* Exs. 4, 5 (July 6, 2020 Screenshots of BOP COVID-19 Cases from BOP Coronavirus Resource Page; BOP Press Release regarding the death of John Dailey).

[15] In a previous action brought by some of the Plaintiffs, Judge Flanagan made a preliminary, non-binding determination that their claims were not cognizable in a habeas corpus action. Order Denying Mot. for TRO, Prelim. Inj., and Writ of Habeas Corpus, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 11, 2020), ECF 65. Plaintiffs here include claims under 28 U.S.C. § 2241 (habeas corpus) to preserve those claims for appeal purposes.

24. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201–02 (authority to provide declaratory and other necessary and proper relief), and based on the Court's inherent equitable powers.

25. This Court has jurisdiction over this Class-Wide Petition for Writ of Habeas Corpus because Plaintiffs are detained within its jurisdiction in the custody of Thomas Scarantino, Complex Warden of Butner. Plaintiffs are therefore in custody for the purposes of the federal habeas corpus statute, 28 U.S.C. § 2241.

26. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because Plaintiffs and all other class members are in custody in this judicial district.

27. Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.[16]

## PARTIES

28. PLAINTIFF Charles Hallinan—BOP Register No. 75207-066—is 79 years old. He suffers from bladder cancer and prostate cancer. Both are in remission but require additional checks or treatment that Mr. Hallinan is not currently receiving due to Defendants' failure to adequately provide treatment during the pandemic. Mr. Hallinan also suffers from hypertension, cardiovascular disease (including a bypass surgery), and celiac disease (an autoimmune disorder), resulting in anemia. Mr. Hallinan is serving a 14-year sentence for RICO, money laundering, and wire fraud charges. He is housed in FCI Butner Low ("Butner

---

[16] "A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority . . . may, except as otherwise provided by law, be brought in any judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1)(B).

- 9 -

Low"), and his projected release date is July 3, 2030. Mr. Hallinan tested positive for COVID-19 in early June. Mr. Hallinan is an individual with a disability for the purposes of the Rehab Act.

29. PLAINTIFF Josean Kinard—BOP Register No. 33603-058—is 34 years old and has no known medical conditions. He has served about 25 months of a 70-month sentence for two counts of drug possession with intent to distribute and possession of a firearm by a person convicted of a felony. He is housed in Butner Low, and his projected release date is May 9, 2022.

30. PLAINTIFF George Riddick—BOP Register No. 72403-053—is 52 years old and in BOP custody from a sentence under the D.C. Code. Mr. Riddick has lymphoma, which is in remission. He is diabetic and suffers from asthma, sleep apnea, and has a history of arthritis. Mr. Riddick had a corneal transplant in February 2019 and takes an immunosuppressant to prevent rejection of the graft. Mr. Riddick has served 15 years of a 15-years-to-life sentence for second-degree murder while armed, possession of a firearm during the commission of a crime, and carrying a pistol without a license. Mr. Riddick is housed in FCI Butner Medium II. Mr. Riddick is an individual with a disability for the purposes of the Rehab Act.

31. PLAINTIFF Jorge L. Maldonado—BOP Register No. 63756-018—is 52 years old. He has kidney disease and has had two kidney transplants, and he must remain on immunosuppressant medication for the rest of his life. Mr. Maldonado is experiencing blood in his urine, and based on recent tests, his kidney may be failing; however, Defendants have chosen not to take him to see a nephrologist. Mr. Maldonado also has malignant hypertension due to his kidney disease, tachycardia, and squamous cell carcinoma. Mr. Maldonado has served about 41 months of an 84-month sentence for tax fraud. Mr.

Maldonado is housed at the minimum-security camp adjacent to FCI Butner Medium I. Mr. Maldonado is an individual with a disability for the purposes of the Rehab Act.

32. PLAINTIFF William Brown—BOP Register No. 26720-045—is 49 years old. He has had two kidney transplants, and he must remain on immunosuppressant medication for the rest of his life. He also suffers from diabetes, hypertension, and sleep apnea, for which he uses a breathing machine. Mr. Brown is currently serving an 11-year sentence for conspiracy to distribute cocaine. Mr. Brown is housed at the minimum-security camp adjacent to FCI Butner Medium I, and his projected release date is March 21, 2026. Mr. Brown is an individual with a disability for the purposes of the Rehab Act.

33. PLAINTIFF Terrance Freeman—BOP Register No. 27135-076—is 43 years old. He has a history of heart problems, most recently congestive heart failure that required open heart surgery. He also suffers from hypertension, respiratory deficiency, and a kidney injury. Mr. Freeman is currently serving a 12-year sentence for conspiracy to distribute drugs. Mr. Freeman is housed at the minimum-security camp adjacent to FCI Butner Medium I, and his projected release date is February 8, 2025. Mr. Freeman is an individual with a disability for the purposes of the Rehab Act.

34. PLAINTIFF Anthony Butler—BOP Register No. 65583-056—is 35 years old. He suffers from diabetes, Hepatitis B, and a heart murmur that causes him shortness of breath. Mr. Butler is currently serving a five-year sentence for one count of felony in possession of a firearm and one count of possession of a firearm in furtherance of a drug trafficking crime. Mr. Butler is housed in Butner Low, and his projected release date is November 1, 2025. Mr. Butler is an individual with a disability for the purposes of the Rehab Act.

35. PLAINTIFF Daryl Williams—BOP Register No. 08283-082—is 60 years old. He suffers from Type 2 diabetes and chronic kidney disease. Mr. Williams previously had colon cancer and skin cancer. Mr. Williams is currently serving an 80-month sentence for bank robbery. Mr. Williams is housed in FCI Butner Medium I. His projected release date is July 3, 2024. Mr. Williams is an individual with a disability for the purposes of the Rehab Act.

36. PLAINTIFF Quamain Jackson—BOP Register No. 22401-084—is 27 years old and has no known medical conditions. He has served about one year of a 20-month sentence for possession of a firearm by a person convicted of a felony. He is housed in FCI Butner Medium II, and his projected release date is April 25, 2021.

37. PLAINTIFF Lasalle Waldrip—BOP Register No. 14525-047—is 53 years old. He suffers from Type 2 diabetes and hypertension. Mr. Waldrip has served 11 months of a 46-month sentence for possession of marijuana with intent to distribute. He is housed in Butner Low. His projected release date is January 23, 2023. Mr. Waldrip is an individual with a disability for the purposes of the Rehab Act.

38. DEFENDANT Thomas Scarantino is the Warden of Butner and, in his official capacity, has immediate custody of Plaintiffs and all proposed Class Members. Mr. Scarantino is a final policymaker for running and administering Butner.

39. DEFENDANT Michael Carvajal is the Director of BOP and, in his official capacity, is responsible for the safety and security of all persons—including Plaintiffs and all proposed Class Members—serving federal and D.C. Code sentences at BOP facilities, including Butner. Mr. Carvajal is a final policymaker for running and administering BOP.

40. DEFENDANT Jeffery Allen, M.D. is the Medical Director of BOP and, in his official capacity, is the final BOP health care authority responsible for all health care delivered to

incarcerated people, including assessing each individual's risk factors for severe COVID-19 illness, risks of COVID-19 at the Butner, and risks of COVID-19 at the location in which an incarcerated person seeks home confinement before the BOP may grant discretionary release.[17] Dr. Allen also evaluates the suitability for and reviews requests for compassionate release.[18] Among others, Dr. Allen is a final policymaker for BOP.

41.   DEFENDANT Federal Bureau of Prisons is a United States federal law enforcement agency within the DOJ. BOP was established in 1930 pursuant to Pub. L. No. 71-218. 46 Stat. 325 (May 14, 1930) and is charged with managing and regulating federal penal and correctional institutions. BOP controls and operates Butner and has immediate custody over Plaintiffs and all other putative class members. BOP is an executive agency for the purposes of the Rehab Act. Messrs. Carvajal and Barr, among others, are policymakers for BOP.

### NOTICE OF RELATED CASES

42.   Per Rule 40.3(b) of the local civil rules of the U.S. District Court for the Eastern District of North Carolina, Plaintiffs provide notice that this case arises from a common nucleus of operative facts with, and therefore is a "related case" to the following:

- *Hallinan et al. v. Scarantino et al.*, No. 5:20-HC-02088-FL. *See* Dkt. 66, June 29, 2020 (stipulation of voluntary dismissal without prejudice).

- *United States v. Antwan Harris*, No. 5:11-CR-247-BO. *See* Dkt. 126, Sep. 1, 2020 (motion for compassionate release granted).

---

[17]   Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, 2 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download [hereinafter, "Barr March 26 Memo"]; *Program Statement 6010.05*, Federal Bureau of Prisons, Health Services Administration, 3 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf.

[18]   *Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Federal Bureau of Prisons, Health Services Administration 6, 13-14 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

- *United States v. Anthony Butler*, No. 5:18-CR-00475-BO. *See* Dkt. 77, Sep. 17, 2020 (motion for compassionate release denied; appeal pending).

FACTUAL ALLEGATIONS

**I.    COVID-19 Is a Dangerous, Contagious Illness that Poses a Significant Risk of Serious Illness and Death**

43.   COVID-19 is a deadly and highly contagious disease caused by a novel coronavirus.[19] COVID-19 spreads through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days.[20] People who are asymptomatic can unknowingly transmit the virus, making its spread particularly difficult to slow.[21]

44.   As of October 19, 2020, there have been more than 40 million confirmed cases of COVID-19, and more than 1.1 million related deaths.[22] More than 8.1 million of these cases and more than 210,000 deaths were in the United States.[23] The mortality rate for COVID-19 in the United States by population equates to about 60 deaths per every 100,000 people. At Butner, in comparison, the rate equates to about 600 deaths per every 100,000 people.[24]

---

[19]   On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a pandemic. *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS (last visited Oct. 19, 2020).

[20]   Ex. 6 (*How COVID-19 Spreads*, Centers for Disease Control and Prevention (Oct. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html); *see also* Beyrer Decl. at 5–6, 16.

[21]   *How COVID-19 Spreads; see also* Beyrer Decl. at 5, 17, 20–21.

[22]   COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHHU), Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map html (last visited Oct. 18, 2020).

[23]   *Id.*

[24]   *Mortality Analysis*, Johns Hopkins University of Medicine, https://coronavirus.jhu.edu/data/mortality (last updated August 13, 2020)).

- 14 -

45. All people, regardless of age or health, risk serious illness and death from COVID-19.[25] The case fatality rate can be significantly higher depending on the presence of certain demographic and health factors. The rate is higher in men, and varies significantly with advancing age, rising after age 50, and is above 10 percent (1 in 10 cases) for those with pre-existing medical conditions including cardiovascular disease.[26]

46. Certain categories of people face especially high risks of serious illness or death from COVID-19, including people aged 50 years or older.[27] If infected, people in this group are more likely to require hospitalization, more likely to be admitted to intensive care units ("ICUs"), and more likely to die.[28] According to the CDC, people aged 50-64 who develop COVID-19 are four times more likely to be hospitalized than 18 to 29-year-olds, and 30 times more likely to die.[29] People aged 65 to 74 are five times more likely to be hospitalized than 18 to 29-year-olds and 90 times more likely to die.[30]

47. People of all ages face higher risk of hospitalization and death if they have underlying medical conditions, including cancer, diabetes, chronic obstructive pulmonary disease ("COPD"), moderate to severe asthma, serious heart conditions (such as heart failure or coronary artery disease), obesity (Body Mass Index, or "BMI," of 30 or higher), chronic kidney disease, or compromised immune systems (such as from a solid organ transplant,

---

[25] Ex. 7 (*Assessing Risk Factors*, Centers for Disease Control and Prevention (Oct. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/assessing-risk-factors.html).

[26] *See, e.g.*, Beyrer Decl. at 3, 9.

[27] *See, e.g.*, Exs. 8, 9, 10 (Xianxian Zhao, et al., *Incidence, Clinical Characteristics and Prognostic Factor of Patients with COVID-19: A Systematic Review and Meta-Analysis* (March 20, 2020), https://cutt.ly/etRAkmt; *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart*, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report); *Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults html)/.

[28] Xianxian Zhao, *et al.*; *see also* Beyrer Decl. at 3, 8–9.

[29] Ex. 11 (*COVID-19 Hospitalization and Death by Age*, Centers for Disease Control and Prevention (Oct. 18, 2020) https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age html).

[30] *Id.*

blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other immune weakening medicines), sickle cell disease, stroke, or other immune deficiencies, cerebrovascular disease, cystic fibrosis, hypertension, neurologic conditions (such as dementia, liver disease, or pulmonary fibrosis), current or former smoking, and thalassemia.[31]

48. According to the World Health Organization ("WHO")-China Joint Mission Report, the COVID-19 mortality rate is 13.2 percent for those with cardiovascular disease, 9.2 percent for diabetes, 8.4 percent for hypertension, 8.0 percent for chronic respiratory disease, and 7.6 percent for cancer.[32] The WHO reports that people with high blood pressure are more likely to develop serious COVID-19 illness than others.[33]

49. According to a CDC report published in May 2020, 30 percent of all hospitalized COVID-19 patients required mechanical ventilation.[34] The mortality rate among COVID-19 patients on mechanical ventilation is estimated to be between 30 and 50 percent.[35]

50. People who survive COVID-19 can suffer severe damage to lung tissue, including permanent loss of respiratory capacity, and damage to other vital organs, such as the heart,

---

[31] Xianxian Zhao, *et al*.; *see also* Beyrer Decl. at 20–21.

[32] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.; *see also* Beyrer Decl. at 20–21.

[33] *Q&A on Coronaviruses (COVID-19)*, World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited Oct. 19, 2020).

[34] Beyrer Decl. at 3.

[35] *Id.*

central nervous system, and liver.[36]  COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle.[37]

51.     Even young, healthy people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[38]

52.     Serious complications from COVID-19 can develop rapidly.[39]  Some individuals show the first symptoms of infection within two days of exposure, and their conditions can seriously deteriorate in less than five days.[40]

53.     People who develop serious illness often require advanced medical support, including specialized equipment, such as ventilators and large teams of highly trained care providers such as ICU doctors, nurses, and respiratory therapists.  The artificial ventilation process is itself invasive and dangerous, and some patients must be placed in medically induced comas for such treatment.[41]

---

[36]  Panagis Galiatsatos, *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine (Apr. 13, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs (last visited October 19, 2020).  COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.  *Id.*; *see also* Beyrer Decl. at 3–4.

[37]  Beyrer Decl. at 3.  Myocarditis can reduce the heart's ability to pump.  *Id.*

[38]  Kerry Kennedy Meltzer, *I'm Treating Too Many Young People for the Coronavirus*, The Atlantic (March 26, 2020), https://www.theatlantic.com/ideas/archive/2020/03/young-people-are-not-immune-coronavirus/608794/ (last visited Oct. 19, 2020); *see also What is ECMO*, 193 Am. J. Respir. Care Med 9–10 (2016), https://www.thoracic.org/patients/patient-resources/resources/what-is-ecmo.pdf (describing function of extracorporeal membrane oxygenation machine to replace function of heart and lungs).

[39]  *See* Sarah Jarvis, *Coronavirus: How Quickly Do COVID-19 Symptoms Develop and How Long Do They Last?*, Patient (Apr. 20, 2020), https://patient.info/news-and-features/coronavirus-how-quickly-do-covid-19-symptoms-develop-and-how-long-do-they-last (last visited Oct. 19, 2020).

[40]  *Id.*; *see also* Beyrer Decl. at 4.

[41]  Kathryn Dreger, *What You Should Know Before You Need a Ventilator*, NY Times (Apr. 4, 2020), https://www.nytimes.com/2020/04/04/opinion/coronavirus-ventilators.html (last visited Oct. 19, 2020).

## II. The Risk from COVID-19 Is Particularly High in Prisons

54. According to CDC guidelines, only three measures are known to effectively reduce the spread of this fatal disease: (i) diligent "social or physical distancing" to avoid transmission of the virus;[42] (ii) covering the mouth and nose with a mask or cloth;[43] and (iii) vigilant hygiene practices, including frequently washing hands and disinfecting surfaces.[44]

55. Physical distancing is a necessary predicate for hygiene practices, such as handwashing, to have a meaningful impact.[45] Because asymptomatic people can transmit the virus, it is critical to maintain physical distance, even among people who show no signs of illness.[46]

56. In prisons, incarcerated persons and staff interact in close proximity and cramped quarters designed to confine people rather than distance them. Incarcerated people, by the fact of their incarceration, have little autonomy or control of their movements. As a result, incarcerated people are highly susceptible to rapid transmission of the virus through contact with other people, including asymptomatic carriers, and touching common surfaces.[47]

57. Incarcerated people, correctional staff, medical staff, and contractors regularly move in and out of correctional facilities and across different housing units within prisons. Such

---

[42] *See, e.g.*, Ex. 12 (*Social Distancing, Quarantine, and Isolation*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing html); Beyrer Decl. at 5–6.

[43] *See, e.g.*, Ex. 13 (*How to Protect Yourself & Others*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention html).

[44] *See id.* For additional guidance related to prevention of COVID-19 in prisons specifically, *see also* Ex. 14 (*COVID-19 in Correctional and Detention Facilities – United States, February-April 2020*, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1 htm (last visited Oct. 19, 2020)) [hereinafter, "*COVID-19 in Correctional and Detention Facilities*"]; Ex. 15 (*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://web.archive.org/web/20201006113319/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention html (July 22, 2020 edition as archived on October 6, 2020)) [hereinafter, "*Interim Guidance*"]; Beyrer Decl. at 6–8; 13–14; 16–17.

[45] *See COVID-19 in Correctional and Detention Facilities*.

[46] *See* Beyrer Decl. at 5, 10, 13, 25.

[47] *See id.* at 5–7, 9, 13.

movement creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus in and out of those facilities, spreading infection and triggering outbreaks.

58.    In addition, prisons are at an increased risk for the rapid spread of an infectious disease—like COVID-19—because of the high number of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and limitations on physical distancing.[48]

59.    As the chart below illustrates, health conditions that make COVID-19 particularly dangerous are more prevalent in the incarcerated population than in the general public.[49]

| Health condition | Prevalence of health condition by population | | | |
| --- | --- | --- | --- | --- |
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

---

[48]   *See generally* I.A. Binswanger *et al.*, *Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population*, 63 J. Epidemiology & Community Health 912 (2009) (concluding that incarcerated people in the U.S. had a higher burden of most chronic medical conditions than the general population, even adjusting for sociodemographic differences and alcohol consumption); *see also* Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020), https://cutt.ly/stERiXk; Beyrer Decl. at 6–7, 9, 13.

[49]   Peter Wagner & Emily Widra, *No Need to Wait for Pandemics: The Public Health Case for Criminal Justice Reform*, Prison Policy Initiative (Mar. 6, 2020), https://cutt.ly/7tJXmlC (color in chart adjusted); *see also* Beyrer Decl. at 9 ("Prison and jail populations are at additional risk due to high rates of chronic health conditions among these people, estimated at more than 38% of people in correctional custody nationally.")

60. In addition to Dr. Chris Beyrer (whose declaration is attached at Exhibit 29), multiple public health experts, including Dr. Gregg Gonsalves,[50] Dr. Ross MacDonald,[51] Dr. Marc Stern,[52] Dr. Oluwadamilola T. Oladeru, Dr. Adam Beckman,[53] Dr. Homer Venters,[54] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[55] and Dr. Josiah Rich[56] strongly caution that incarcerated people are likely to face serious, even grave, harm due to the COVID-19 outbreak.

61. The CDC and WHO have also identified prisons as especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations.[57] According to the CDC:

- Environments like prisons "heighten[] the potential for [COVID-19] to spread once introduced";

- "Many opportunities exist for [COVID-19] to be introduced into a correctional or detention facility, including daily staff movements";

- "Options for medical isolation for people with COVID-19 are limited";

- Incarcerated people "may hesitate to report symptoms of COVID-19 . . . due to co-pay requirements . . . and fear of isolation";

---

[50] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Connecticut Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[51] Craig McCarthy & Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo.

[52] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

[53] Oluwadamilola T. Oladeru, *et al.*, *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind* (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[54] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[55] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020), https://cutt.ly/stERiXk.

[56] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[57] *See Interim Guidance*.

- "Incarcerated/detained persons and staff may have underlying medical conditions that increase their risk of severe illness from COVID-19"; and

- Incarcerated persons have limited ability to "exercise disease prevention measures (*e.g.*, frequent handwashing)" due to restrictions put in place by many prison facilities.[58]

62. Among the specific recommendations from the CDC for mitigating the risk of COVID-19—tailored to the prison realities—is the implementation of distancing strategies to increase physical space between incarcerated people—"ideally 6 feet between all individuals, *regardless of symptoms*."[59] According to the CDC, distancing is "a cornerstone of reducing transmission of . . . COVID-19."[60] Distancing strategy includes reassigning and/or rearranging bunks to provide more space, enforcing increased space between people in common areas, staggering recreation times, and staggering meals.[61]

63. The CDC also recommends, among other things: (i) individually quarantining and medically monitoring close contacts of confirmed COVID-19 cases—including testing;[62] (ii) daily temperature checks in housing units where COVID-19 cases have been identified;[63] (iii) face mask requirements for all individuals showing symptoms of COVID-19;[64] (iv) immediately placing symptomatic individuals into *individual* medical isolation that is "distinct from punitive solitary confinement" and ensuring that they "receive[] regular visits from medical

---

[58] *Interim Guidance*.
[59] *Id.* (emphasis added).
[60] *Id.*
[61] *Id.*; Beyrer Decl. at 25.
[62] *COVID-19 in Correctional and Detention Facilities – United States, February-April 2020* at 19.
[63] *Id.* at 22.
[64] *Id.* at 15–16. CDC also recommends encouraging all staff and incarcerated people to wear masks "as much as safely possible." *Interim Guidance*.

staff";[65] (iv) actively encouraging staff to stay home when sick;[66] and (v) frequent and thorough cleaning and disinfection of surfaces, objects, and areas.[67]

64. Jail administrators in Washington County, Oregon;[68] Cuyahoga County, Ohio;[69] Los Angeles, California;[70] San Francisco, California;[71] Jefferson County, Colorado;[72] and the state of New Jersey,[73] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.[74] These non-judicial avenues underscore the importance of release.

## III. COVID-19 Has Spread Rapidly at Butner

65. Butner is a complex of BOP facilities—FMC Butner, Butner Low, FCI Butner Medium I ("Medium I"), and FCI Butner Medium II ("Medium II")—collectively housing approximately 3,974 men.[75]

---

[65] *Id.* (emphasis added); *Interim Guidance*. CDC defines "medical isolation" as "confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission." *COVID-19 in Correctional and Detention Facilities – United States, February-April 2020* at 4.

[66] *Interim Guidance*.

[67] *Id.* at 9.

[68] KATU, *Washington Co. Jail Releases Inmates to Meet Social Distancing Guidelines*, KCBY (April 28, 2020), https://kcby.com/news/local/washington-co-jail-releases-inmates-to-meet-social-distancing-guidelines.

[69] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic* (March 20, 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[70] Alene Tchekmedyian, *More L.A. County Jail Inmates Released Over Fears of Coronavirus Outbreak*, L.A. Times, (March 19, 2020 6:55 p.m.), https://cutt.ly/ItRSCs6.

[71] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26*, San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.

[72] Jenna Carroll, *Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR Colorado (March 19, 2020 2:29 p.m.), https://cutt.ly/UtRS8LE.

[73] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.

[74] Internationally, governments and jail staff have recognized the threat posed by COVID-19 and released large numbers of detained persons. For example, France released approximately one-seventh of its total prison population. Benjamin Dodman, *As France Releases Thousands, Can Covid-19 End Chronic Prison Overcrowding?*, FRANCE24.COM (April 27, 2020), https://www.france24.com/en/20200427-as-france-releases-thousands-can-covid-19-end-chronic-prison-overcrowding. In Iran, more than 85,000 people were released from jails to curb the spread of coronavirus. Morning Edition, *Iran Releases 85,000 Prisoners But Not Siamak Namazi*, NPR (March 18, 2020), https://www.npr.org/2020/03/18/817606513/iran-releases-85-000-political-prisoners-but-not-siamak-namazi.

[75] *See Population Statistics: Inmate Population Breakdown, Federal Bureau of Prisons,* https://www.bop.gov/mobile/about/population_statistics.jsp (last updated October 22, 2020) (showing populations for

66.     Butner has experienced one of the worst COVID-19 outbreaks of any BOP facility.

67.     At the end of March 2020, BOP reported that two incarcerated people at Butner had COVID-
        19.  By April 10, BOP reported that 60 incarcerated people at Butner had it.  By April 13,
        four people at Butner had died of COVID-19.  By the end of April, more than 200 people at
        Butner had COVID-19.

68.     In the first half of May, the reported active cases dropped below 100, but then came roaring
        back to more than 600 active cases by mid-June.

69.     Twenty-six people held at Butner have died from COVID-19—more than twice as many as
        at any other BOP facility and one-fifth of all the deaths in the BOP.[76]  The most recent death
        was a man who had COVID-19 in June and apparently contracted it again near the end of
        the summer, dying from it on September 17, 2020.[77]

70.     So far, nearly a quarter of the total population of incarcerated people at Butner (at least 900)
        and 81 staff members have tested positive for the virus.[78]

71.     Although the number of reported current infections has declined in the last couple of months,
        there continue to be a steady stream of cases, demonstrating that the virus remains circulating
        at Butner.  Further, Defendants are progressively opening the facility without taking the
        precautions necessary to prevent a resurgence.  As demonstrated earlier this year, the number
        of infected people can grow exponentially and rapidly, with deadly consequences.

---

Butner Low FCI (970), Butner Medium I FCI (591), Butner Medium II FCI (1,389), and Butner FMC (816).  FCI
Butner Medium I also houses another 146 men in an adjacent minimum-security satellite camp.  *Id.*

[76]    *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last
visited Oct. 19, 2020) [hereinafter, "*COVID-19 Cases*"].

[77]    *COVID-19 Cases.*

[78]    *Id.*

**IV.    Defendants' Actions – and Inaction – Put People Incarcerated at Butner at a Very High Risk**

72.    Butner's housing conditions make it impossible for incarcerated people to physically distance.

73.    The increased risks of the prison layout are exacerbated by the presence of a large number of people housed at the prison with disabilities and who are otherwise medically vulnerable.

74.    Despite the high risk, Defendants have tested too few people at Butner, too infrequently, and too late.  What is more, even where Defendants conducted widespread testing in a housing unit or facility, they failed to separate people who tested positive from those who tested negative for *several days after* receiving the test results.  In the meantime, Defendants forced potentially COVID-positive and COVID-negative incarcerated persons to continue sleeping, receiving meals, picking up medications, and conducting other day-to-day activities in close proximity to one another without the ability to physically distance.

75.    Screening for symptoms has also been sporadic and ineffectual.  Whether a person incarcerated at Butner will be removed from other incarcerated people due to potential COVID status appears to be determined solely by whether the person has a high temperature.  Staff at Butner occasionally have checked the temperatures of all people in a housing unit, but even then, Defendants inconsistently asked questions about other COVID-19 symptoms.  If an incarcerated person suspected that he may be running a temperature, Defendants generally have required the person to request "sick call," which requires a $2.00 co-pay.  In some—but not all—cases, Defendants checked temperatures for men who were required to leave their unit for work assignments or hospital visits outside Butner.

76.    Defendants have failed to implement cleaning and disinfection procedures to adequately protect the men housed at Butner.

77. Rather than take established measures to stop the spread of the virus, around the beginning of April 2020, Butner purported to "lockdown." This lockdown had a number of adverse effects—described more fully in the sections that follow—such as:

- People housed in facilities other than the FMC with serious medical conditions who ordinarily would have been treated at the FMC could no longer go there, so they did not receive necessary medical treatments.

- People housed in celled units could leave their units only during certain times. Therefore, large groups of people were required to use the showers, phones, and computers in a short time period, concentrating the use of these facilities and ensuring that people congregated in these confined areas.

- BOP placed people believed to have COVID-19 in solitary confinement cells known as the Special Housing Unit ("SHU"). The SHU is not medical isolation;[79] rather, it is essentially punitive solitary confinement, with some reporting that those placed in the SHU were denied access to necessary medications, phone usage, and/or hot water. Further, because of the SHU's punitive nature, some incarcerated people who were sick reportedly concealed their conditions as long as they could to avoid being sent to the SHU, demonstrating that the BOP policy increased the likelihood of spreading the illness within the facility. As early as March, Defendants knew that their policy of placing symptomatic people into the SHU resulted in people hiding their symptoms to avoid placement in the SHU.[80]

---

[79] *See, e.g.*, Beyrer Decl. at 22–24 (describing medical isolation).
[80] Declaration of Mary Strassel, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (E.D.N.C. June 3, 2020), ECF 37-11 at 11-12.

- During the lockdown, meals and medicines were delivered to housing units in most facilities at Butner. As a result, people in dormitory-style housing units had to line up in confined spaces multiple times a day to receive their meals and medications.

78. When people do get sick with COVID-19, treatment is almost non-existent. In some cases, staff check vital signs and give Tylenol. In others, there is not even that level of care and monitoring. Individuals who test positive for COVID-19 should have increased access to medical personnel who consistently check on those individuals, not limited medical treatment.[81]

79. Although Butner has an FMC, BOP generally leaves people in their respective Butner facility until they are already experiencing respiratory failure. Only then do Defendants transfer them to a hospital.[82]

80. As described in further detail below, Defendants' actions put all people who are incarcerated at Butner at substantial risk of serious harm.

81. Additionally, Defendants have failed to make reasonable modifications for people at Butner whose disabilities put them at a heightened risk from the virus. Defendants have not ensured that people with disabilities can access food, medicine and medical treatment, recreation, housing, or communications on an equal basis with the other people housed at Butner. Because there have been no modifications made for them, in order to access these programs, services and activities, the Disability Subclass must subject themselves to an increased risk of serious illness and death to access these programs, services, and activities.[83]

---

[81] Beyrer Decl. at 23.

[82] *See, e.g.*, Ex. 5 (Press Release, Inmate Death at FCI Butner I, U.S. Dep't of Justice Federal Bureau of Prisons (Apr. 13, 2020), https://www.bop.gov/resources/news/pdfs/20200413_3_press_release_butner.pdf ("John Doe, went into respiratory failure at the Federal Correctional Institution (FCI) Butner I . . . . He was evaluated by institutional medical staff and transported to a local hospital for further treatment and evaluation.")).

[83] *See generally* Beyrer Decl.

- 26 -

82. These conditions and risks are known to Defendants.

### A. FMC Butner

83. FMC Butner is a federal medical center that houses men designated as Care Level 4.[84] This is the highest level of healthcare need in the BOP.[85]

84. Patients at Care Level 4 "require services available only at a BOP Medical Referral Center, which provides significantly enhanced medical services and limited inpatient care."[86] Examples of conditions that result in a Care Level 4 are: "Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy."[87]

85. FMC Butner provides specialized services in all areas of medicine and is BOP's primary referral center for oncology, chemotherapy, and radiation therapy.[88]

86. FMC Butner also manages a broad range of subacute and chronically ill incarcerated men.[89]

87. The fifth floor of the FMC houses patients who are extremely ill, including those on hospice care. The fourth floor houses patients undergoing treatment for cancer. The third floor houses patients who are having ambulatory surgeries. The second floor houses patients who are seriously mentally ill for psychiatric care.

88. Most of the men who are housed in FMC Butner live in two-person cells.

---

[84] *See* Bureau of Prisons: Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs, United States Government Accountability Office, 64 (June 2017), https://www.gao.gov/assets/690/685544.pdf ; PREA Audit Report at 2. The FMC houses people at Care Level 4 for medical and mental health reasons.

[85] *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons, 2–3 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

[86] *Id.* at 3.

[87] *Id.*

[88] *Id.*

[89] *Bureau of Prisons: Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs*, United States Government Accountability Office, 64 (June 2017) https://www.gao.gov/assets/690/685544.pdf.

89.   The fourth floor, for patients receiving cancer treatment, is divided into four units of roughly 60 people each. The residents of each unit must all share two phones.

90.   Some cells on the fourth floor of the FMC share ventilation systems such that individuals in one cell can hear those in the cell next to them when they speak or cough.

91.   On the third floor, prior to the lockdown, people were allowed out of their cells from 6:00 a.m. until 9:00 p.m. There are two phones for each side of the third floor. When patients are allowed out of their cells, the phones are used fairly constantly.

92.   COVID-19 was first reported at the FMC at the end of March 2020 and the FMC was locked down around that time.[90]

93.   Shortly thereafter, in April 2020, the BOP informed people housed in the FMC that there were cases of COVID-19 on the second and fifth floors of the FMC.

94.   Movement of patients and incarcerated people who live in the Cadre unit ("Cadre workers") between areas of the FMC continued during the lockdown, despite the presence of COVID-19 within the facility.

95.   For at least two months, Defendants housed—purportedly for purposes of quarantining—some people who transferred into Butner on the fourth floor of the FMC, where the residents are immunocompromised due to cancer treatment.

96.   Cadre workers move from floor to floor picking up and distributing laundry, food trays, and commissary. People who worked on the fourth floor of the FMC distributed food and medicine to both the cancer patients and those people in quarantine.

---

[90] Ex. 16 (Mar. 30, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page as archived by the Internet Archive on April 15, 2020). When BOP first reported COVID-19 at FCC Butner, it reported all cases at the FMC. *See id.* (reporting two cases at the FMC), *see also* Ex. 17 (April 1, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page as archived by the Internet Archive on April 15, 2020) (reporting nine cases at the FMC). By April 5, BOP started disaggregating the cases of COVID-19 at Butner by facility. Ex. 18 (April 6, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page as archived by the Internet Archive on April 15, 2020) (reporting seven cases at the Low, one case at the FMC and three cases at Medium 1).

97.     Defendants also quarantined people on the third floor of the FMC, including people who were symptomatic, had been tested, and were awaiting their test results.

98.     In early July, the BOP relaxed the lockdown of the FMC. Defendants permitted people to come out of their cells into the dayroom area two days a week to use the phone, get ice and hot water, and, on one day a week, use the computer. They were also allowed to go outside for recreation two days a week for an hour.

99.     After the lockdown was relaxed, people lined up to use the phones and computers. Defendants did not require physical distancing at the computers in the FMC, or in the lines to use the phones and computers.

100.    In late July 2020, BOP re-imposed the lockdown because there was another outbreak of COVID-19 on the second floor.

101.    As of October 19, 2020, at least 17 people incarcerated at FMC Butner and 25 staff members have tested positive for COVID-19.

102.    Defendants have not conducted widespread testing of people housed at the FMC. Generally, people have been tested only before leaving for an appointment outside Butner or if they had certain COVID-19 symptoms.

103.    Defendants' cleaning and disinfecting practices at the FMC have been inadequate. For example, during the 78 days from March 13 to May 29, the third, fourth, and fifth floors of the FMC were cleaned approximately 30 times and there was no additional cleaning for "high touch" areas.[91]

104.    Critically, the serious problems posed by Defendants' response (or lack thereof) to COVID-19 do not come solely from the infection itself. As part of Butner's response to COVID-19,

---

[91] *See* Butner FMC Sanitation Log, *Hallinan et al. v. Scarantino et al.*, No. 5:20-HC-02088-FL (M.D.N.C.), Dkt. No. 40-4.

medical visits and treatments at FMC Butner for *existing* serious chronic illnesses have been severely curbed or halted for people residing in other parts of Butner. For example:

- Plaintiff Ross was supposed to be transferred to the FMC to have a port placed and to begin dialysis. The procedure has not yet occurred and he continues to suffer from the effects of his failing kidneys.

- Plaintiff Riddick was supposed to have stitches in his eye removed in February following a cornea implant; however, as of September, all of his stitches have still not been removed.

- Plaintiff Hallinan is supposed to have treatments for bladder cancer at the FMC every four to six months to prevent recurrence. His last treatment was in early January 2020.

105. There are approximately 120 people housed in the Cadre Unit, a dormitory-style unit in the FMC where incarcerated people who work in the FMC live. The unit has cubicles that are roughly 6 feet by 9 feet. The cubicles are separated by walls about six feet high and house two or three people each.

106. The Cadre Unit has communal phones and computers that can only be used after waiting in lines, and a shared TV room and restroom facilities where it is impossible for people to maintain physical distance from one another.

107. Some men in the Cadre Unit work jobs that require them to travel to other units within the FMC, such as those who work in the Inmate Companion Program, through which they assist FMC nurses with incarcerated or committed patients who cannot care for themselves. Some of the men in the Cadre Unit are responsible for picking up and distributing laundry, commissary orders, and food trays for patients. People who do these jobs move from cell to cell, and from floor to floor.

### B.    Butner Low

108.   Butner Low[92] is a low-security federal correctional institution.

109.   A primary function of Butner Low is to house individuals designated as Care Level 3.[93] These men "have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications, . . . [such as] [c]ancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, and end-stage liver disease."[94]   In other words, Butner Low houses a large number of medically vulnerable and disabled people, including several Plaintiffs.

110.   Butner Low contains eight dormitory-style units, each with a capacity of about 150 men.

111.   The housing units are large, open rooms divided into cubicles.   The cubicles are about 10 feet by 7 feet, with walls about 5 to 6 feet high.   The photo below, published by the Associated Press, purports to show a dorm with cubicles at Butner Low.

---

[92]   Butner Low is sometimes referred to as "LSCI Butner."

[93]   *PREA Audit Report*, at 2.

[94]   *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf., at 5.



112. Most cubicles house two or three people, though a small number house only one, often due to wheelchairs.  There is only about a 4 foot by 4 foot space, if that, to move around in the cubicles.

113. Because of the cubicle arrangement, most people housed in Butner Low sleep within six feet of several other people.  In other words, the hundreds of men in Butner Low—many of them elderly, medically vulnerable, or disabled—spend several hours *every night* within the CDC's suggested minimum physical distancing zone.

114. Like all facilities in the complex, due to the COVID-19 outbreak, Butner Low was on lockdown from late March or early April through sometime in July 2020, meaning Defendants curtailed certain normal activities.

115. During the lockdown, people requiring medication had to line up at one or more of three daily "pill calls."  Defendants did not require people to physically distance in the pill line.  Sometimes the lines had as many as 60 people in them.  Thus, every day—and sometimes

more than once a day—Defendants forced medically vulnerable people to stand in very close proximity to one another for extended periods of time to receive their medications.

116. The same medical staff conducted multiple pill calls per shift across multiple housing units, and they did not change protective gear, disinfect equipment, or otherwise decontaminate themselves as they moved from unit to unit.

117. Defendants did not make reasonable accommodations to allow members of the Disability Subclass, all of whom are at increased risk of suffering severe illness from exposure to COVID-19, to safely obtain their medication without increased exposure to COVID-19. Instead, members of the Disability Subclass were forced to choose between not receiving their medication or lining up with dozens of other people in close proximity to one another, thereby increasing their exposure to this deadly disease.

118. During the height of the lockdown, the situation was similarly grim at mealtime. From April through sometime in July 2020, those housed in Butner Low were forced to line up in their housing units, with only one to two feet between one another, to receive their meals. In at least one case, Defendants made men from one unit line up with men from another unit, substantially defeating any intended purpose behind the staggered meal-time process. Defendants did not make reasonable accommodations to allow members of the Disability Subclass, all of whom are at increased risk of suffering severe illness from exposure to COVID-19, to safely obtain their meals without increased exposure to COVID-19. Instead, Defendants forced them to choose between eating or lining up with dozens of other people in close proximity to one another, thereby increasing their exposure to this deadly disease.

119. The current process at mealtime similarly requires close contact with others. For some meals, the men of each unit are required to walk to the kitchen to receive their meals and

walk back to the unit—all in a single-file line.  For other meals, they line up in their housing unit to receive the meals at the front of the unit.

120. Likewise, access to phones and computers is problematic, with people densely packed in lines for extended time periods.  Plaintiffs report that the six to eight phones shared in each unit—which are in regular use—are about two feet apart and are not disinfected between uses.  People wait in line for about 30 to 60 minutes to use the phone.  Computers are also within a few feet of one another, and in regular use.  In some housing units, there is a spray bottle and rag by the phones and computers available for people to use.  However, because there are lines of people waiting, if someone chooses to use it, they cannot leave the disinfectant on for ten minutes, as is required for it to kill the virus.

121. Moreover, Defendants have not adequately instructed the incarcerated people on the use of the anti-viral disinfectant.  In some housing units, a notice was posted in early August informing people of the need to let the disinfectant sit for ten minutes.  Defendants have not made reasonable accommodations for members of the Disability Subclass to be able to safely use the phones, computers, and/or other communal resources.  The policy of not taking measures to allow people incarcerated at Butner to safely use phones, computers, and/or other communal resources affects people with disabilities more harshly than those without.

122. People housed in Butner Low share a small number of toilets, showers, and sinks across the entire housing unit.  The fixtures are all within three feet of each other, meaning that people are in very close contact with one another in the bathroom areas.  Cleaning supplies are not made readily available.  The soap and chemicals used to clean the bathrooms are routinely diluted with water.

123. Once again, Defendants have failed to make reasonable accommodations for the Disability Subclass to use restroom and bathing facilities without increasing their risk of exposure to COVID-19.

124. TV rooms were closed during the height of the lockdown, but according to some Plaintiffs, the TVs were on and visible from an area just outside the computer room. People gathered closely together outside the computer room to watch the TVs. Because the TV rooms were closed, people used the common area for other purposes, like as a makeshift seating area for playing games. Notably, because the lockdown allowed for limited opportunities to exercise, people exercised in the common area, leading to more close contact with others.

125. The TV rooms were reopened in July. Originally, there were 80 chairs in the TV rooms. After the lockdown, there were only supposed to be 25 chairs in the TV rooms. Some chairs were removed at first, but they were brought back.

126. The TV rooms are often crowded, and physical distancing is not enforced.

127. In late August, the people in one of the housing units in Butner Low were informed that there was going to be an inspection. In connection with the inspection, they needed to remove the extra chairs from the TV room until 4:00 p.m., when the visitors were there. After the visitors left, they were told that they could bring the extra chairs back into the TV room. Others received similar instructions to clean up, go to their units, and wear their masks when visitors arrived. After the visitors left, physical distancing and mask wearing were no longer enforced.

128. Some Plaintiffs report being given cloth masks. Some do not fit. Some are made of material so thin it is translucent. If masks are damaged or lost, Defendants do not provide a way to repair or replace them. The BOP has not given Plaintiffs gloves.

129. BOP inconsistently enforces the requirement to wear masks. Not all staff wear masks. Some incarcerated people also do not wear their masks.

130. Many people have frequent contact with people from other housing units. Work details in housing facilities, laundry, the commissary, food service, and safety and recreation all include men from multiple housing units.

131. Butner Low has a Federal Prison Industries ("UNICOR") operation where people from different housing units work. At some points during the last six months, in one housing unit, at least 24 people were going to their jobs with UNICOR where they worked with people from other housing units. Similarly, people worked in the kitchen with people from other housing units.

132. A man in one housing unit was an orderly assigned to clean the SHU, where some people who had COVID-19 were housed. This orderly would then come back to the housing unit where he lived.

133. A man in another housing unit had a job cleaning personal protective equipment used by sick people in other housing units, meaning he came into frequent contact with items used by people with COVID-19.

134. Currently, correctional officers and other staff move between housing units where some have COVID-19 and some do not. For example, during count, the officers in one housing unit help the officers in another, and vice versa.

135. Men from different housing units also intermingle during recreation time. For example, six or seven days a week, men from at least two different units take photos of individuals from all eight housing units. The photographers and subjects do not wear masks, even when standing shoulder-to-shoulder to view the photos on screens.

136. People from different housing units also intermingle when seen by medical staff. Men called to medical from one unit often arrive to find men from another unit still waiting to be seen. Medical staff do not consistently change their personal protective equipment between patients or between units.

137. Defendants do not conduct routine temperature checks to identify feverish people.

138. Where temperature checks previously occurred, they were sporadic, ineffectual, and inconsistent across units. For example, on one housing unit, Wake A, medical staff took everyone's temperature every day for about a week at the beginning of the lockdown in early April, then again on May 11 or 12, and then three times during the last week of May. Outside of those times, a person had to request a sick call to get a temperature check—which costs $2.00. In another housing unit, there was a single temperature check around May 7. People leaving their housing units for jobs were supposed to be checked for a fever each time they left, but the checks happened only occasionally.

139. Making all these issues worse, Butner Low is at or over maximum capacity. The facility was designed to hold 992 people, but as of October 19, 2020, BOP reports that 999 men are housed there.[95]

140. All these conditions—crowding in already tight quarters; shared use of limited facilities with frequent close contact; lengthy, daily line-up requirements; inconsistent mask use amongst staff and incarcerated people; and limited testing and screening—created the extraordinarily dangerous conditions that made the COVID-19 outbreak at Butner Low fully foreseeable.

---

[95] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

141. At the beginning of May 2020, roughly one month after COVID-19 was first reported at Butner, 27 incarcerated people at Butner Low had tested positive for the virus.[96] None had died.

142. About a month later, by May 31, 2020, 180 people housed at Butner Low had tested positive, of whom four had died and 39 had reportedly recovered.[97] One of the men who died had informed staff that he was not feeling well, had trouble breathing, and could not eat, but staff did not remove him from his unit because he had no fever. He died of COVID-19 days later after going into respiratory failure.[98]

143. On or around June 1, 2020, Defendants tested everyone housed in the Low.

144. Over the ten following days, Defendant BOP reported increasing numbers of people testing positive at Low:

- June 3: BOP reports 418 people have tested positive;[99]

- June 7: BOP reports 587 people have tested positive;[100]

- June 8: BOP reports 670 people have tested positive;[101]

- June 9: BOP reports 676 people have tested positive;[102] and

---

[96] Ex. 19 (May 1, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

[97] Ex. 20 (May 31, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

[98] *See* Press Release, *Inmate Death at FCI Butner (Low)*, U.S. Dep't of Justice Federal Bureau of Prisons (May 21, 2020), www.bop.gov/resources/news/pdfs/20200531_press_release_butner.pdf.

[99] Ex. 21 (June 3, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

[100] Ex. 22 (June 7, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

[101] Ex. 23 (June 8, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

[102] Ex. 24 (June 9, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

- June 10: BOP reports 696 people have tested positive.[103]

145. Despite the total number of COVID-positive cases at Butner rising by almost *100 cases per day* between June 3 and June 9, Defendants waited until June 10—an entire week—before finally beginning to separate those who had contracted the virus as of June 1 from those who had not.

146. Between June 1, when people were tested, and June 10, when the facility was divided into positive and negative units, the staff failed to consistently check temperatures or monitor symptoms across the units in Low.

147. During this period, in some units, if a person got so sick that Defendants removed him from the unit, the BOP would evaluate the people in his cubicle, but not the people in adjacent cubicles.

148. On June 10, BOP identified over half the facility as having the virus. Based on the tests from June 1, 2020, Defendants divided the Low facility into housing units where people tested positive and housing units where people tested negative. This process took place over the course of about three days.

149. The so-called negative units were not disinfected between when people who had tested positive were moved out and when people who had tested negative were moved in.

150. In one of the units established as a negative unit, Granville A, three to four people were removed because they were sick. One man who had no symptoms was moved to a positive unit, suggesting that he was moved because of his test results.

151. After the housing units were divided between positive and negative units, temperatures were not checked and there was no symptom screening unless someone made a sick call.

---

[103] Ex. 25 (June 10, 2020 Screenshot of the Federal Bureau of Prisons' COVID-19 website at https://www.bop.gov/coronavirus/index.jsp).

152. In the positive units, where everyone was believed to have COVID-19, for the first couple of weeks, there was no COVID-19 care or monitoring at all. Staff did not take people's temperatures or check vital signs. Starting about the last week of June, medical staff began asking people in at least one of the positive housing units whether they had symptoms. Medical staff no longer making rounds to assess symptoms.

153. Between the positive and negative units, medical staff circulated with the pill cart, with the same staff conducting pill call for both positive and negative units.

154. Administration of tests for COVID-19 is inconsistent and has yielded inaccurate results. Some staff insert the nose swab into the sinus, and some insert it just inside the nostril.

155. In late July, one of the negative units was tested for COVID-19. Fourteen people tested positive and were taken to the SHU.

156. At least one person who tested negative was mistakenly assigned to a positive unit. He was moved to a negative unit weeks later, and was not quarantined in between.

157. BOP staff sent individuals who had been exposed to COVID-19 to negative housing units and failed to correct this problem before those individuals had the opportunity to interact with others within the negative unit.

158. Some people from positive units who have been determined to have recovered have been moved into negative units, but they have been assisted in making the moves by people still housed in the positive unit.

159. In many instances, adjacent units have different designations, so one is maintained as a positive unit, and the other as a negative unit. However, on multiple occasions, Defendants assigned only one officer to monitor both a positive unit and its adjacent negative unit—

leaving the doors separating the units unlocked to enable individuals to walk back and forth between the two units.

160. People within Butner Low who previously held or currently hold jobs at UNICOR have been reassigned to new units without first being screened or re-tested for COVID-19. As of October 15, 2020, BOP reports that one person housed in the Low has tested positive and that 620 have recovered.

161. However, from the end of May through mid-August, Defendants re-tested only those men who tested positive in May. Men who tested negative in May were not re-tested, even when other men in the same unit or even the same cubicle became seriously ill with COVID-19 or tested positive.

162. Some men within FCC Butner have tested positive for the virus more than once, with a negative test in between. In Butner Low, an older man with underlying conditions tested positive in June, then negative in July, then positive again in September at an outside hospital, where he died of COVID-19. Despite his negative test in early July, Defendants continued to house him in a unit with men who continued to test positive through at least mid-August.[104]

163. Defendants stopped testing the population at Butner Low by mid-August.

### C. FCI Butner Medium I and Camp

164. FCI Butner Medium I is made up of a medium-security federal correctional institution and a minimum-security camp ("Camp").

---

[104] *See* Press Release, *Inmate Death at FCI Butner (Low)*, U.S. Dep't of Justice Federal Bureau of Prisons (Sept. 17, 2020), https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf.

165. As of October 15, more than 180 people incarcerated at FCI Butner Medium I and 30 staff members have tested positive for COVID-19. Nine people incarcerated in Medium I have died so far from the disease.[105]

### 1. The Camp

166. BOP reports that 149 men are housed at the Camp.[106] Many of the conditions at the Camp are substantially similar to those at Butner Low. For instance, the Camp has dormitory-style housing divided into shared cubicles that do not allow for physical distance from bunkmates.

167. Incarcerated people are moved among the four housing units within the Camp based on their current medical status. People who test positive for COVID-19 and are symptomatic are housed communally in the Hatteras East unit. Those who test positive and are asymptomatic are housed in Catawba East if they have been classified as care level 1 or 2, or Catawba West if classified as care level 3. Those who test negative are housed in Hatteras West.

168. The doors between the four units are unlocked, and men from different units frequently open the doors to speak with one another.

169. People in each Camp housing unit share a single bathroom with about four stalls, five showers, and five sinks. There is no hand sanitizer, and the soap sometimes runs out. People wait in line to use the toilets and sinks one right after the other.

170. People line up within two feet of each other to use the phones. People are permitted to clean the phones between uses, but no one is responsible for this job, and no disinfectant is provided. Some people attempt to clean phones between uses by wiping them on their clothes.

---

[105] *COVID-19 Cases.*
[106] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp. (last updated October 15, 2020) (last visited October 19, 2020).

171. The TV room is always crowded, and people place chairs within six feet of one another to watch TV for long periods of time.

172. Men leave their housing units for meals and medication, which sometimes involves contact with men from other units. Entire housing units line up at the unit door for meals, and men from different units line up together for medication. As in Butner Low, people line up no more than two feet apart from one another.

173. Throughout the lockdown, men in the Camp continued to go to work at their jobs in the UNICOR operation at Medium I, the kitchen, commissary, warehouse, landscaping, or elsewhere, alongside people from other housing units. At some of these jobs, incarcerated people regularly come into contact with outside contractors or people making deliveries. Other jobs, such as landscaping, involve work in close proximity to men from other housing units on the recreation yard and officers who go to the hospitals and back. Men on work detail have their temperatures checked at the beginning of their shift, but are not monitored for any other symptoms of COVID-19. After their shifts, men on work detail have recreation time together before going back to their separate units.

174. On at least one occasion, a shift has been canceled when someone on the work detail tested positive for COVID-19. The next day, everyone was sent back to work.

175. Access to laundry has been reduced in the Camp during the pandemic. Defendants have eliminated two laundry days per week and cut in half the number of sheets and blankets the men can wash. The entire unit's laundry is combined into one bin, which sits in the unit overnight before being washed together.

176. Everyone in the Camp is provided with a thin cloth mask, but mask-wearing is inconsistent and not enforced. No instructions have been provided on how to clean masks.

- 43 -

177. Staff do not consistently wear masks. Some staff consistently do *not* wear masks, including one staff member whose mask is always pushed down around her neck, not covering her mouth or nose, while she works handling food for the men who live at the Camp.

178. In March 2020, the Camp Administrator held a town hall meeting with at least one housing unit, Hatteras East, during which she told people housed in that unit that they should not worry about the virus or masks. Additionally, the Assistant Warden told men in that unit that wearing a mask would result in a disciplinary write-up.

179. When people housed in the Camp have reported COVID-19 symptoms to BOP staff, they have been ignored, and people with symptoms (but no fever) have received no medical treatment.

180. For example, one man who suffers from a rare autoimmune disease passed out in his unit and was taken to see medical staff, who told him that he should drink more water before being returned to his unit in the Camp. Only after he passed out in his unit for a second time the following day did medical staff test him for COVID-19 and discover that he was positive.

181. Plaintiff Freeman told medical staff during a temperature check that he was experiencing loss of taste and smell, chills, night sweats, body aches, congestion, coughing, shortness of breath, and fighting to get out of bed. Because he did not have a fever, he was not taken out of his unit. He later tested positive for COVID-19. He was not taken to see a doctor, has not been re-tested for COVID-19, and has not seen a doctor since initially reporting his symptoms. He remains in his housing unit and continues to experience a persistent hacking cough and digestive issues, and he has woken up at night unable to breathe.

182. During a temperature check, Plaintiff Brown also reported his symptoms, which included fatigue, inability to eat, diarrhea, hot and cold sweats, dry throat, dry cough, and loss of taste

and smell. The nurse he spoke with wrote down his name and said someone would follow up with him, but no one ever did. He remained in his unit and had trouble getting out of bed for about two weeks. He never received pain reliever, fluids, a doctor's visit, or any follow-up assistance from anyone on the medical or custodial staff. He continues to experience COVID-19 symptoms.

183. Plaintiff Brown was tested for COVID-19 only after a man in his unit died of the virus. The man had told staff more than once that he didn't feel well, but he was not taken out of the unit. Not long after that, the man lost consciousness and hit his head on the sink. He was taken to the hospital, where he died of COVID-19.

184. Another sick man in Plaintiff Brown's unit lost consciousness during a lockdown, and no officers or other staff were present. Plaintiff Brown helped fan the man and put a continuous positive airway pressure ("CPAP") mask on him while other people in the unit pounded on the doors for help, but no one came. Ultimately, someone used an off-limits phone to call for outside help. Medical personnel arrived about 45 minutes after the man lost consciousness.

185. Given the conditions at the Camp and inconsistent adherence to whatever policies BOP purports to have enacted to address COVID-19, it is unsurprising that the disease has spread rapidly throughout the Camp. As one person housed there explained:

> I first heard of someone in my unit becoming sick and having to be removed in early April, after which it felt like a chain reaction within the camp. . . . [S]uddenly it seemed as if everyone in my unit was ill. . . . At night, I would hear coughing all throughout the unit. . . . My entire unit was tested for coronavirus on or around April 23, 2020. We were not isolated or separated from one another in any way while we waited for results. On or around April 30, 2020, Dr. Beyer gathered our unit together and told us that the entire unit had tested positive for coronavirus. She also told us that as many as 80% of the entire Camp population tested positive for coronavirus, and that a large number of people testing positive for the virus had only mild or no symptoms.

186. Defendants are providing inadequate medical care for men with conditions other than COVID-19 during the pandemic, including underlying conditions that increase the risk of serious illness and death from COVID-19.

187. Plaintiff Maldonado, a kidney transplant recipient, has been prescribed a renal diet, weekly bloodwork to monitor his kidney, and visits to a nephrologist every six months. He has not received a renal diet, has not had weekly bloodwork since July, and has not seen the nephrologist since January. He has also been prescribed visits to the dermatologist every six months for his squamous cell carcinoma, but he has not been taken to the dermatologist in about a year. He is not receiving any other treatment. He has lost about 50 pounds since the summer and does not know why.

188. Plaintiff Maldonado has yet to be released despite the recommendations of his doctor and social worker, and despite his home plan being approved. Defendants' explanations for denying his requests for release have included both that he is too sick to leave prison and too healthy to qualify for release. Although his medical condition is currently stable, his transplanted kidney has begun to fail. He understands from his doctor that the longer Defendants prevent him from accessing the care he needs, the more likely he is to lose his kidney.

189. The BOP houses men who are new arrivals or awaiting early release in makeshift spaces throughout the Camp, which have at various times included the chapel, classroom, and beside the pool tables in the indoor recreation area. These spaces are set up with cots, and physical distancing is not required. The doors to these makeshift housing spaces are not consistently locked, so men inside can open the doors and talk to people from other units on the recreation yard and elsewhere.

190. There is no shower in the makeshift housing spaces, so the men who live there use showers in the Catawba East and Hatteras West housing units. In the Hatteras West unit, the only safeguard against infection is a partial wall inside the bathroom installed by BOP staff to separate the people who are being quarantined from those who are not. Air flows freely from one side of the wall to the other. An orderly from the housing unit enters the bathroom after the men who are quarantined leave, cleans it, and then returns to the common area.

191. Men awaiting release sometimes spend months in these makeshift spaces. One man currently housed in quarantine was approved for release in May. Another has been in quarantine since he had a heart attack over the summer and was approved for release.

192. Defendants are not performing regular temperature checks in the Camp to identify people who have fevers and are not asking people if they have symptoms. Men in the Camp have not been offered flu shots.

193. However, men in the Camp are currently experiencing new symptoms of COVID-19, including coughing and chills in the Catawba West unit. The men in Catawba West have not been tested for the virus since their new symptoms began.

194. On October 18, a man from the Hatteras West unit who had previously tested positive for COVID-19 and recovered from it then tested positive for the virus for a second time. He

was taken to the SHU.  The other men in his unit have not been tested for the virus and are now locked down in their unit together.[107]

### 2.    FCI Butner Medium I

195.  Like Butner Low, Medium I houses men with health care needs classified as Care Level 3.[108]

196.  At Medium I, people are housed in cubicle-style housing and celled units.  The celled units generally hold two people per cell.  Medium I houses approximately 579 people.

197.  In the spring of 2020, there was a COVID-19 outbreak in Medium I.

198.  Despite that outbreak, Defendants do not routinely check temperatures or consistently screen for symptoms of COVID-19.

199.  After he was sick for about two weeks and experienced a fever of 105 degrees, Defendants placed Desmond Garrett, who is housed in Medium I, into quarantine on March 31.  At that time, Mr. Garrett was having trouble breathing.  He was given a COVID-19 test and placed in a cell in the SHU with another man, although neither of the two men had received their test results.  The test results did not come back for five more days.

200.  On March 24, Plaintiff Ross experienced COVID-19 symptoms and put in a sick call.  He went to medical, was told he had the flu, and was sent back to his unit.  On March 28, after a unit-wide temperature check, he learned that he had a fever and was taken to medical, where a nasal swab was administered.  He was placed into quarantine the same day in the North Carolina unit, which is a celled unit.  When he was placed into the unit, he had a

---

[107]  Another man previously housed in Hatteras East, Ernest Rowland, died at the beginning of October.  Mr. Rowland had previously tested positive for COVID-19 and recovered.  He was in his mid-60s and wheelchair-bound, and had trouble breathing.  In the days prior to his death, he had coughed up blood and had an abnormally high heartrate, of which the doctors at the FMC were aware.  It is unclear whether Mr. Rowland's death was related to COVID-19.

[108]  See FCC Butner Doctoral Psychology Internship 2019–2020 Brochure, Federal Bureau of Prisons, 11 (July 15, 2018), https://www.bop.gov/jobs/docs/BUX%20Brochure%202019-2020.pdf ("Additionally, Care Level Three inmates (chronically mentally ill persons) who can function adequately on an outpatient basis are housed throughout the complex.").

cellmate and neither of them had received their test results. They received the test results the following day; both were positive.

201. Currently, if Defendants determine a person needs to be isolated, BOP places the person in the celled North Carolina unit. People are not tested either when they are placed in isolation or when they are released from isolation. In general, people are released back to general population after 14 days in quarantine, though sometimes it is far less.

202. The lockdown was relaxed at Medium I in May or June 2020. After that, meals were brought to the housing units, and the men had to line up to receive their meals, three times a day. There are roughly 50 to 60 people in the lines. There is no physical distancing.

203. Similarly, since the lockdown was relaxed, pill call has been conducted in the housing units. The men who need medications must line up one or more times a day to receive their medications. The lines have 10 to 15 people in them. There is no physical distancing.

204. There are usually lines for the phones and computers. The phones are about five feet from each other. The computers are right to each other. Because they are in use most of the time, people using them are within five feet of other people. In the lines where people wait to use the phones and computers, people do not physically distance.

205. Since the COVID-19 lockdown in Medium I, healthcare for other conditions has also been extremely limited. For example, Plaintiff Ross' ankles and stomach swell up about three times a month, and the swelling lasts from three days to one week, due to his kidney disease. Although Plaintiff Ross needs dialysis, BOP has told him that he cannot have that medical procedure yet due to COVID-19.

206. The cleaning and disinfecting protocols in Medium I are inadequate.

207. For several weeks in June and July, the cells were sprayed down with a backpack sprayer once a week when people were outside in the recreation yard. This cleaning process stopped around mid-July.

208. The dayroom area is mopped down every two days with a mop. The backpack sprayer is not used for the dayroom area.

209. When disinfecting solutions are applied to phones, computers, or tables, they are not left on for ten minutes but are instead wiped off right away. Door handles, garbage bins, ice machines, water dispensers, and shared recreational items are not cleaned.

### D. FCI Butner Medium II

210. Medium II is a medium security federal correctional institution.

211. Many people in Medium II are at high risk of serious illness or death from COVID-19.

212. People incarcerated in Medium II are housed in celled units of about 120 to 130 people, with one to four people per cell. Cells range from 8 feet by 8 feet to 8 feet by 12 feet, depending on the number of people housed in them. People housed in these cells sleep on bunk beds, and in four-person cells, the beds are about two feet apart in an "L" shape.

213. Medium II was on lockdown from late March or April to early July 2020. Since July 3, the restrictions in Medium II have been slowly loosened.

214. Other than during the lockdown, people housed in Medium II are out of their cells for most of the day, mingling with each other. There is no physical distancing.

215. Medium II is also home to the SHU, where some people with COVID-19 symptoms have been placed. The SHU is not medical isolation; it is typically used for administrative detention (such as inmate transfers) or disciplinary segregation.

216. Medium II has a UNICOR operation at which numerous people housed in Medium II work. Many people housed in Medium II have jobs with either UNICOR or a private contractor.

And, like men who work in the other UNICOR operations, they work side-by-side with men from other housing units.

217. Staff move between housing units. They also move into the community. At some point in May, one staff member informed an incarcerated person that he was responsible for watching three incarcerated people with COVID-19 at an outside hospital.

218. Medium II is overcrowded. BOP reports that 1,422 men are housed there,[109] exceeding the facility's maximum capacity of 1,152 people by approximately 23 percent.[110]

219. Each cell has a shared toilet and sink. People in each 120-person housing unit share about 12 showers spaced about three feet apart.

220. Since the end of the lockdown, people housed in Medium II walk to the cafeteria each day for lunch. Only one housing unit at a time eats, but the cafeteria is not cleaned between each group of people.

221. As in other facilities, there are communal phones spaced a few feet apart; people stand in close proximity to each other in lines waiting for the phones. There is no physical distancing in these lines. An orderly cleans the phones twice a day, but the disinfectant is not left on for ten minutes. Incarcerated people can use personal items to wipe the phones between uses, but such items may not be clean themselves, and Defendants do not make readily available the supplies to disinfect the phones in between each use.

222. The Medium II computer room is similar to that in other parts of Butner: a common room where people sit shoulder-to-shoulder at computers that are constantly in use with groups of people waiting in close proximity for their turn.

---

[109] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp. (last updated October 15, 2020) (last visited October 19, 2020).

[110] *See PREA Audit Report*, at 1.

223. Defendants have not provided any instruction or implemented any protocol for cleaning certain areas within Medium II. Those housed there are instead responsible for taking the initiative to clean the areas themselves. For instance, the laundry room and staircases are cleaned infrequently and only when an incarcerated person decides to clean them.

224. The dayroom tables are generally cleaned twice a day by an orderly. The cleaning solution is sprayed on and wiped off immediately.

225. Door handles do not get cleaned.

226. At the beginning of the outbreak of COVID-19, people housed in Medium II were provided very thin, ill-fitting, and poorly made cloth masks. They were not provided with any instruction as to how to properly wear and/or clean their masks. And, as in other facilities, not all staff wear masks.

227. Hand sanitizer has not been readily available in Medium II.

228. There has been no widespread testing for the virus in Medium II.

229. If a person in the unit feels sick, he typically must request a $2.00 sick call to get a temperature check. At best, temperature checks have been administered sporadically.

230. Defendants have taken some people with high enough temperatures or other symptoms to the SHU. Still, people taken to the SHU are not necessarily tested for COVID-19. One man was taken to the SHU at the beginning of the outbreak after he began experiencing flu-like symptoms, but he was not tested for COVID-19 before returning to Medium II. On information and belief, the men in the cells surrounding his were also not tested.

231. Individuals experiencing symptoms other than a fever are not evaluated or removed from their housing units. For instance, Plaintiff Riddick reported that he was coughing and sneezing for a couple of days without a staff member asking about his symptoms.

## V. BOP's Failure to Implement Adequate Prevention and Mitigation Measures Is Deliberate Indifference to the Risk of Harm to Plaintiffs

### A. BOP Is Aware of the Risks to Plaintiffs

232. Defendants have a "profound obligation to protect the health and safety of all [incarcerated people]."[111] Despite this obligation, BOP as a whole—and Butner in particular—has failed to adequately protect the incarcerated people under its charge who have disabilities or other conditions that render them medically vulnerable to COVID-19.

233. Based on confirmed cases, in addition to Butner, COVID-19 has entered more than 100 of the total 130 facilities BOP runs, including Butner.[112]

234. As of October 19, 2020, BOP houses 125,905 people and has a staff of approximately 37,000.[113] As of the same date, more than 18,237 incarcerated people and more than 2,000 BOP staff members had tested positive for coronavirus, for a total of more than 20,000 *known* positive individuals.[114]

235. So far, 128 people held in BOP facilities have died from COVID-19.[115] Twenty-six of those people died while incarcerated at Butner.[116] Two BOP staff members have died, including one at Butner.

236. In a March 26, 2020 memorandum to Defendant Carvajal regarding the COVID-19 "crisis" (the "March 26 Memo"), Attorney General William Barr identified home confinement as

---

[111] Ex. 26 (Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, (Apr. 3, 2020), https://www.justice.gov/file/1266661/download, at 1).

[112] *COVID-19 Cases.*

[113] *COVID-19 Cases.*

[114] *Id.* The significant week-to-week jump in positive cases may be a result of increased testing within BOP, but the point remains.

[115] *COVID-19 Cases.*

[116] *Id.*

"[o]ne of BOP's tools to manage the prison population and keep [incarcerated people] safe" from COVID-19.[117]

237. The Attorney General directed Defendant Carvajal "to prioritize the use of [the BOP's] various statutory authorities to grant home confinement for [incarcerated people] seeking transfer in connection with the ongoing COVID-19 pandemic," because "for some eligible [people], home confinement might be more effective in protecting their health."[118]

238. Attorney General Barr further identified "[t]he age and vulnerability of the [incarcerated person] to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," as one of the critical, discretionary factors for consideration.[119]

239. Five days later, on April 1, Defendants issued an order to lock down Butner because of COVID-19. This, too, is an acknowledgment of the risk posed by the virus.

240. A few days later, following dramatic increases in confirmed COVID-19 cases at BOP facilities, Attorney General Barr issued a second memorandum underscoring BOP's "profound obligation to protect the health and safety of all [incarcerated people]" and finding that "emergency conditions are materially affecting the functioning" of BOP.[120]

241. The Attorney General recognized that BOP efforts to prevent the spread of COVID-19 within its facilities "have not been perfectly successful."[121] He ordered Defendant Carvajal to take more aggressive steps—immediately—to transfer incarcerated people to home confinement where possible, even if electronic monitoring will be not be available, explaining that "time is of the essence."[122]

---

[117] Barr March 26 Memo at 2.
[118] *Id.*
[119] *Id.*
[120] *See* Barr April 3 Memo at 1.
[121] *Id.* at 2.
[122] *Id.*

242. Additionally, in an acknowledgment of the risks from COVID-19, BOP issued a COVID-19 Action Plan and implemented modified operations.[123] The Action Plan requires quarantine or isolation for all new admissions, all close contacts of confirmed or suspected cases, and all incarcerated people set for release.[124]

243. Defendants recognize the importance of continual monitoring of the population for symptoms.[125]

244. At Butner, as early as March 2020, Defendants recognized the need "to ensure social distancing between inmates and staff."[126] They acknowledged the importance of minimizing contact between people in different parts of the prison.[127] They were aware of the need to quarantine incarcerated people with exposure risk factors, even if they were not symptomatic.[128] They were also aware of the need to ensure the continuity of care for individuals who needed health care at the FMC but were not housed there.[129] They further recognized the importance of sanitizing the facility.[130] By late March, Defendants had recognized the importance of mask usage.[131]

---

[123] *See BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Oct. 19, 2020).

[124] *See* Ex. 27 (*Memorandum for All Chief Executive Officers: Coronavirus (COVID-19) Phase Six Action Plan*, Federal Bureau of Prisons (Apr. 13, 2020), https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf).

[125] *See BOP Correcting Myths and Misinformation*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf (stating that throughout the BOP, "health services staff are conducting rounds and checking inmate temperatures at least once a day. In those locations where inmates are in quarantine or isolation, Health Services staff are conducting rounds and temperature checks twice a day.")

[126] Declaration of Mary Strassel, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 37-11 at ¶ 14.

[127] *Id.*

[128] March 13, 2020 Memorandum for the Inmate Population (LSCI), *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 37-20 at 2.

[129] Declaration of Mary Strassel, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 37-11 at ¶ 16.

[130] *Id.* at ¶¶ 14, 53.

[131] *Id.* at ¶¶ 40, 46, 53.

245. Defendants know this deadly disease devastated Butner and that their "Kafkaesque approach"[132] to mitigation is inadequate to address the very real threat posed by COVID-19 and to protect the people incarcerated there. In one opinion granting compassionate release for a person previously housed at Butner, the court noted, "*by the government's own admission*, [medical care] would be hard to come by should defendant be infected with the deadly disease currently spreading widely through his prison."[133]

246. Despite knowing full well the urgency of the situation, Defendants have not implemented most of the mitigation measures they identified in early March—before any of the hundreds of cases at Butner, before any of the 27 deaths—and have instead maintained conditions that allow the virus to ravage the prison population.

**B.** **Defendants Have Failed to Meaningfully Respond to the Grave Risk Facing Incarcerated People at Butner**

247. Defendants know the risk to incarcerated people at Butner but have not taken well-known and essential measures to address the risk, including making reasonable accommodations for the Disability Subclass to allow them to participate in everyday activities without placing them at increased risk of contracting the deadly disease.

---

[132] *United States v. Scparta*, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020).

[133] *United States v. Bikundi*, 2020 WL 3129018, at *5 (D.D.C. June 12, 2020) (emphasis added); *see also United States v. Heitman*, 2020 WL 3163188, at *4 (N.D. Tex. June 12, 2020) (referring to the number of confirmed active COVID-19 cases at Butner Low as "staggering"); *United States v. Malone*, 2020 WL 3065905, at *6 (W.D. La. June 9, 2020) ("[I]it is understandably concerning that at a time when social distancing is critical, FCI Butner Medium I is housing ninety-three inmates in a thirty-eight-person unit where the inmates share five showers, four toilets, and two phones. While this is worrisome for all of the inmate population, it is more so for . . . high-risk individuals."); *United States v. Howard*, 2020 WL 2200855, at *4 (E.D.N.C. May 6, 2020) (noting that the number of infected persons at Butner is among "the highest in the nation"); *United States v. Joling*, 2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020) (referring to BOP's response to the COVID-19 pandemic as "insufficient as evidenced by the number of infections and deaths which have already occurred in federal custodial institutions").

248. Instead, Defendants have taken only minimal action.  Failing to adequately respond to the deadly virus ravaging Butner constitutes deliberate indifference to Plaintiffs' health and safety in violation of the Eighth Amendment.[134]

### 1. Defendants have failed to use the tools available to them to reduce the population at Butner

249. Because of the severity of the threat posed by COVID-19 and its proven ability to rapidly spread through a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19, including the Class.[135]  Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus and also mitigates risks for people in prison and the broader community.[136]  Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that many people will become seriously ill from COVID-19 at the same time.[137]  But, even though BOP officials have been instructed to transfer people to home confinement, Defendants have opposed such measures at Butner.  A court order is therefore necessary to provide adequate care that does not violate federal law.

250. On March 26, Attorney General Barr instructed Defendant Carvajal to prioritize transferring people from BOP facilities to home confinement because of the risk from COVID-19.[138]  On March 27, President Trump signed the CARES Act, giving the Attorney General expanded power to immediately release prisoners on account of COVID-19.  On April 3, Attorney

---

[134] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *see also De'lonta v. Johnson*, 708 F.3d 520, 523 (4th Cir. 2013) (finding deliberate indifference standard could be met even though there was not a "total failure to give medical attention" or provide adequate support; *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 211 ("the mere fact that prison officials provide some treatment does not mean they have provided '*constitutionally adequate* treatment.'") (emphasis in original).

[135] *See, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We Must Release Prisoners to Lessen the Spread of Coronavirus*, Washington Post (March 17, 2020), https://wapo.st/2JDVq7Y; Beyrer Decl. at 9–10, 12–14, 26.

[136] Beyrer Decl. at 9, 12, 26.

[137] Beyrer Decl. at 11, 13.

[138] *See* Barr March 26 Memo.

General Barr instructed Defendant Carvajal to take aggressive steps—immediately—to transfer people in BOP custody to home confinement where possible, explaining that "time is of the essence."[139]

251. As discussed above, Butner houses many medically vulnerable people. Over 1,000 people at Butner, including many of the medically vulnerable population, are considered either minimum or low security prisoners. Thus, many people at Butner should have been transferred to home confinement pursuant to Attorney General Barr's instructions. And yet, across all BOP facilities, BOP has transferred only one person per facility every two days. Defendants have transferred very few of the people incarcerated at Butner to home confinement.[140] As of June 3, 2020, two months after Attorney General Barr's second memo, just 42 people had been transferred to home confinement from Butner.[141]

252. Moreover, even once a person is approved for home confinement, Defendants choose to delay transfer. John Dailey, a plaintiff in a prior suit, was approved for transfer to home confinement in late April. But, instead of transferring him immediately, BOP delayed his transfer until August. Mr. Dailey's transfer to home confinement—a measure expressly taken to reduce his risk of contracting COVID-19—never came. As a direct result of BOP's unwarranted delay, Mr. Dailey contracted COVID-19 and died on July 3.

253. Defendants could support the people in their custody in their efforts to obtain compassionate release. They choose not to. For example, Lewis Huntley filed a motion for compassionate

---

[139] *See* Barr April 3 Memo at 2.

[140] In fact, while Attorney General Barr directed BOP to release *more* vulnerable incarcerated people, BOP paradoxically *heightened* the standard for eligibility, *decreasing* the number of people eligible for home confinement. Ian MacDougall, *Bill Barr Promised to Release Prisoners Threatened by Coronavirus—Even as the Feds Secretly Made It Harder for Them to Get Out*, ProPublica (May 26, 2020), https://www.propublica.org/article/bill-barr-promised-to-release-prisoners-threatened-by-coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out (last visited Oct. 19, 2020).

[141] Memo. in Supp. of Mot. to Dismiss, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 35, at 9.

release based on, among other things, hypertension that made him especially vulnerable to COVID-19. The court granted his motion over Defendants' opposition. Similarly, Defendants opposed John Krokos' motion for compassionate release over the course of nine months, before a court granted the motion and he was released. Antwan Harris, a plaintiff in the former class action lawsuit filed against Butner, was released over Defendants' objection in August.[142] Similarly, courts granted motions for compassionate release over Defendants' objections in August for former plaintiffs Arnold Hill and Lee Ayers.[143] Roger Duane Goodwin, a declarant in the earlier class action suit, was released over Defendants' objection in September.[144] In at least 20 instances, the court has ordered a person's release from Butner after Defendants opposed the motion for compassionate release.[145]

254. Despite the spread of COVID-19 at Butner, infecting hundreds and killing 26 incarcerated men already, Defendants remain unwilling to use the tools available to them to move the most vulnerable people out of Butner with sufficient urgency. This failure constitutes

---

[142] Order, *United States v. Harris*, No. 5:11-CR-247-BO (E.D.N.C. Aug. 31, 2020).

[143] *United States v. Hill*, No. 1987 FEL 11252 (D.C. Super. Ct. Aug. 3, 2020); *United States v. Ayers*, No. 2008 CF3 020985 (D.C. Super. Ct. Aug. 13, 2020).

[144] Order Granting Defendant's Renewed Motion for Compassionate Release, *United States v. Goodwin*, No. 4:18-cr-00021 (S.D. Iowa Sept. 21, 2020).

[145] Ex. 28 (Opinion and Order Granting Defendant Wesam El-Hanafi's Motion for Compassionate Release, *United States v. El-Hanafi*, No. 1:10-cr-00162-KMW (S.D.N.Y. May 19, 2020), ECF No. 252); *see also Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (compassionate release granted involving prisoner at Butner due to COVID-19 concerns); *United States v. Dunlap*, 2020 WL 2062311 (M.D.N.C. Apr. 29, 2020) (same); *United States v. Krokos*, No. 12-cr-00527, Dkt. 1016 (C.D. Cal. May 1, 2020) (same); *United States v. Thompson*, No. 15 CR 00448, Dkt. 80 (N.D. Ill. Apr. 17, 2020) (same); *United States v. Saladrigas*, 2020 WL 4248676 (E.D. Mich. May 13, 2020) (same); *United States v. Rachal*, 2020 WL 3545473 (D. Mass. June 30, 2020) (same); *United States v. Howard*, 2020 WL 2200855 (E.D.N.C. May 6, 2020) (same); *United States v. Perez Alvarado*, 2020 WL 5203386 (S.D. Cal. Sept. 1, 2020) (same); *United States v. Hardnett*, 2020 WL 5074023 (E.D. Va. Aug. 27, 2020) (same); *United States v. Black*, 2020 WL 4583056 (S.D. Ind. Aug. 10, 2020) (same); *United States v. Hamrick*, 2020 WL 4548308 (M.D.N.C. Aug. 6, 2020) (same); *United States v. Luna*, 2020 WL 4696621 (N.D. Cal. Aug. 13, 2020) (same); *United States v. Archer*, 2020 WL 4059694 (D. Nev. July 20, 2020) (same); *United States v. Smith*, 2020 WL 2844222 (N.D. Iowa June 1, 2020) (same); *United States v. Camacho*, 2020 WL 4498796 (W.D. La. Aug. 4, 2020) (same); *United States v. Weems*, 2020 WL 4558381 (S.D. Fla. Aug. 7, 2020) (same); *United States v. Ireland*, 2020 WL 4050245 (E.D. Mich. July 20, 2020) (same); *United States v. Ranck*, 2020 WL 4193487 (S.D. Iowa July 9, 2020) (same); *United States v. Griggs*, 2020 WL 2614867 (D.S.C. May 22, 2020) (same); *United States v. Malone*, 2020 WL 3065905 (W.D. La. June 9, 2020) (same).

deliberate indifference because the incarcerated people must expose themselves to a deadly infectious disease that constitutes a serious risk to health.

255. Releasing people from Butner is essential to control the spread of this deadly virus, but Defendants have chosen not to do so.

### 2. Defendants have not created conditions to allow for physical distancing at Butner

256. To prevent the spread of the virus, the CDC recommends that people should maintain a distance of at least six feet between themselves and others. Defendants recognize the importance of this risk mitigation measure.[146]

257. The CDC recommends rearranging bunks in prisons so that people have more space between them while they sleep.[147] In Butner, Defendants have failed to release people or transfer them to home confinement so there would be fewer people in the sleeping arrangements. And no such rearrangement of sleeping quarters has occurred. Instead, people sleep within a few feet of multiple other people. Nearly every cubicle and cell are full.

258. Further, Defendants allow crowding in dormitories, which results in people being forced to wait in close-packed lines multiple times a day for meals and medicines. Defendants have chosen not to reduce the population so that meal and medication distribution can be accomplished in a manner that does not require scores of men to line up close to one another multiple times a day. Also, Defendants have chosen to distribute meals and medications in a manner that requires large numbers of men to line up in close proximity to each other multiple times a day.

---

[146] Declaration of Mary Strassel, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 37-11 at ¶ 14.
[147] *Interim Guidance* at 11–12 (emphasis added).

259. Similarly, Defendants have not ensured physical distancing in connection with the use of phones and computers. The people incarcerated at Butner are physically close to each other when they use the phones and computers. Because so many people are housed at Butner, phones and computers are in constant use when people are allowed to use them. Further, people wait for the phones and computers in areas that do not provide for physical distancing. Defendants have failed to take any measures to enable people to use the equipment without being close to others.

260. In TV rooms, Defendants have not taken steps to ensure physical distancing either. Though Defendants previously limited TV access and the number of chairs in TV rooms, Defendants have not limited the numbers of chairs in the TV rooms since July 2020, despite their initial recognition of the importance of this step. The TV rooms are frequently crowded.

### 3. Defendants have chosen not to find out who in Butner has COVID-19, a crucial step for addressing the risk from the virus.

261. Despite the deaths of at least 26 incarcerated men from COVID-19 at Butner, Defendants have not conducted widespread testing. As of October 19, 2020, 2,177 coronavirus tests had been administered to incarcerated people at the Butner complex, out of a total of approximately 3,974 people. Of these 2,177 tests, approximately 826 were positive.[148]

---

[148] *COVID-19 Cases*. There is reason to be skeptical of BOP's reported statistics. For instance, as of May 12, 2020, BOP's data showed 358 people (including staff) at FCC Butner had tested positive *at some point*, including those who had tested positive and recovered. However, as of May 17, 2020, BOP's reported data showed only 341 people having tested positive at some point at FCC Butner—17 people fewer than five days earlier. While there may be legitimate reasons for the disparity, it is clear that BOP's reported data on COVID-19 in its facilities does not present the full picture.

262. Defendants do not test Butner's staff.[149]  Instead, they rely on "self-reporting and temperature checks."[150]  As of October 13, BOP reported that 75 staff members at Butner had tested positive.[151]

263. Even when they do conduct tests on the people in their custody, Defendants fail to conduct them in a manner designed to help limit the spread of the virus.[152]  For example, after the COVID-19 deaths of four people at Medium I, Defendants tested one housing unit there on or around April 18, and eventually moved those who tested positive to a different unit, Catawba East.  However, Defendants did not move some of those who tested positive out of the unit until about *five days after they learned they had tested positive.*

264. Similarly, after the deaths of five men at Butner Low from COVID-19, Defendants tested everyone there on or around June 1.  Results were returned starting June 3.  Despite many results showing infections—and publicly reporting the increase in infections—Defendants did not move people who had tested positive out of their housing units until after June 10.

265. Thus, with full knowledge of the danger posed by being in close proximity to someone who is COVID-19-positive, Defendants kept known COVID-positive people in close quarters with uninfected people for five or more days.  In all that time, the people who tested positive were not quarantined or isolated, and they shared the same common bathrooms and other resources with those who had tested negative.

---

[149]  Gov't Opp. to Mtn. Compassionate Release, *El-Hanafi* S7 10-cr-162 (KMW) at 16.
[150]  *See BOP Implementing Modified Operations*, Federal Bureau of Prisons https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Oct. 19, 2020).
[151]  *COVID-19 Cases.*
[152]  Beyrer Decl. at 10–11, 17–22.  "Universal testing at this point is the only way to understand how many active infections are present and the extent to which community transmission in the facility is occurring. Without this information, the extent of restrictions necessary to control the infection cannot be ascertained."  *Id.* at 22.

266. Even now, Defendants continue to refuse to test people who are symptomatic or who have been in close contact with someone who is infected. For example, in Medium I, if a person presents with symptoms, he is quarantined but not tested, allowing BOP to continue to report no new positive tests. In the Camp adjacent to Medium I, Defendants have not tested the men who shared the same dormitory and even the same cubicle as the man who tested positive on October 18. Instead, they have locked all the men inside the Hatteras West unit together, without spraying or cleaning the unit, and without determining who is positive and who is negative.

267. Instead of proactively testing for the virus, Defendants sporadically conduct temperature checks. Defendants have informed the public that "Health Services staff throughout the BOP are conducting rounds and checking inmate temperatures at least once a day. In those locations where inmates are in quarantine or isolation, Health Services staff are conducting rounds and temperature checks twice a day."[153] However, temperature checks are rare:

- In one housing unit in Butner Low, temperatures were taken daily for about a week in April, four times in May, and not at all in June, even though the people in that housing unit in June had all tested positive for COVID-19.

- In a housing unit in FCI Butner Medium I, temperatures were taken of everyone in the housing unit a few times in March and April, but not since.

- In a housing unit at FCI Butner Medium II, temperatures of the entire unit have not been taken a single time. A man housed there estimates that he has seen nursing staff take the temperature of three to four people in his housing unit since the beginning of the outbreak.

---

[153] *See BOP Correcting Myths and Misinformation*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.

268. Additionally, when staff do take temperatures, they rarely ask about other symptoms, other than sometimes asking generally if people are "okay."

269. Defendants have chosen to remain willfully ignorant as to who at Butner has COVID-19 until they are forced to acknowledge that someone has it. In so doing, they limit the number of people who are deemed to require quarantine or isolation, leaving an untold number of people infected with the virus in the general population where they can infect others.

### 4. Defendants have failed to establish safe and effective quarantine and isolation practices at Butner

270. The quarantine and isolation practices at Butner are ineffective and dangerous.[154]

271. BOP has a "COVID-19 Action Plan" that requires quarantine for all close contacts of confirmed or suspected cases.[155] Those with symptoms are required to be placed in medical isolation.[156] Neither of these policies has been followed at Butner.

272. According to the Action Plan, quarantine is supposed to last for 14 days,[157] but it often lasts longer. Defendants keep people in quarantine for lengthy periods but take few precautions to prevent people from becoming infected while in quarantine or from infecting others.

273. For example, some people transferring into Butner have been quarantined on the fourth floor of the FMC with cancer patients who are immunocompromised. People who provided services (food, medicine, laundry) to people in quarantine went on to interact with other people in the FMC. The quarantine of new intakes on the patient floors at the FMC allows for the introduction of the virus into the FMC and the spread of the virus from people in the FMC to the people in quarantine.

---

[154] *See* Beyrer Decl. at 18–19, 22–24.
[155] *See Phase Six Action Plan* at 3.
[156] *See Phase Nine Action Plan* at 6.
[157] *See Phase Nine Action Plan* at 6.

274. Defendants also transport people together to quarantine. In late July, Plaintiff Jackson was transported from FMC Butner to FCC Butner II, where he was quarantined prior to being released into the general population. He was transported in a van with approximately six other people from FMC Butner. The other people in the van came from different floors at the FMC, including floors that had active outbreaks of COVID-19 at the time.

275. In the SHU at Medium II, people from different parts of Butner, including locations where there are cases of COVID-19, are quarantined together.

276. In quarantine in the SHU, people are housed with cellmates without any test results indicating whether they are positive or negative.

277. In the minimum-security camp at Medium I, men arriving or awaiting release are quarantined together in improvised spaces including the chapel, classroom, and indoor recreation room. Because these spaces are not designed for residential use, men quarantined there use the shower facilities in housing units that are not under quarantine.

278. People who come into quarantine at the same time are not separated from other people who come into quarantine before or after them. For example, about five to six days after Plaintiff Jackson arrived in quarantine, eight people on the floor where he was quarantined were released from quarantine. Two days later, six new people were brought in.

279. Defendants do not quarantine people who are close contacts of persons who are confirmed to have the virus. In the dormitories, Defendants screen only the individuals who share a cubicle with a person who is found to have the virus, but they do not test them and do not quarantine them. They do not screen everyone who shares the open dormitory or even the people in surrounding cubicles. People who are housed close to or have other close contacts with those who fall sick are not quarantined, screened, or tested.

- 65 -

280. As in the rest of Butner, use of masks appears to be optional in the quarantine area.

281. Isolation practices are also dangerous. Defendants do not immediately put people with symptoms into medical isolation. For example:

- In March 2020, there was an outbreak of COVID-19 at Medium I and its minimum-security camp. Nonetheless, people with symptoms were not removed from the housing units and placed into isolation. For example, Antonio Ross asked to go to sick call in mid-March because he had a cough, body aches, and a sore throat, but was forced to wait more than a week before he was seen. When he was finally seen at sick call, he was not tested for COVID-19 and was not placed into isolation. He was told he had the flu and was sent back to his housing unit. Four days later, medical staff did temperature checks on people in his housing unit, and Mr. Ross was finally placed into isolation.

- In Butner Low, in May 2020, many people had symptoms but were not placed in isolation. For example, John Dailey, a plaintiff in an earlier class action case against Defendants, was sick for several weeks before he was taken out of the housing unit. By the time he was removed, his symptoms were so severe, he had to be transported to the hospital by ambulance. By the end of May, in one housing unit, about half of the people had COVID-19 symptoms and about a third of the people in another housing unit had symptoms.

- Over the course of two to three days starting on June 10, 2020, people at Butner Low were divided into COVID-19-positive and COVID-19-negative units. But the placements were made based on the results of tests taken on June 1, allowing time for people who tested negative to contract the virus. People who had or developed symptoms between the time of the test and the division of people into positive and

- 66 -

negative units were not taken out of the housing units. People who tested negative but developed symptoms between the date of the test and the division into positive and negative units were placed in negative units. And, in some cases, people with negative test results were knowingly placed in positive units.

282. Since the spring, Defendants have continued to shuffle people among the open dormitories within Butner Low and the minimum-security Camp at Medium I. There is no clear correlation between these movements and COVID-19 test results. While waiting for test results, or after someone who tests positive is removed from a housing unit, people who are COVID-19 positive continue to be housed and share communal spaces with people who are negative.

283. Further, within isolation units, symptomatic people are not isolated from each other, even when their test results are not known.

- For example, at Medium I, people in isolation have been housed in the North Carolina unit. People have been placed into "isolation" there with a cellmate, neither of whom has test results for the coronavirus.

- Further, in North Carolina unit, the men who had COVID-19 symptoms, but did not necessarily have test results, had to come into close contact with each other frequently. The cells in North Carolina unit do not have toilets or sinks. This means that prisoners had to share bathroom facilities. The meals were brought to the unit, but the men had to line up to pick them up. A kitchen worker would bring the food cart to North Carolina unit, and then go back to the kitchen.

- Additionally, some isolation units are not actually isolated. For example, people with COVID-19 symptoms are being "isolated" on the third floor of the FMC. As noted

above, the people who bring food, medicine, and commissary to other patients on the floor also bring them to the people in isolation. As of late July 2020, the use of the third floor for isolation was being expanded.

- In April or May 2020, Defendants set up an isolation area in the chapel in the minimum-security camp at Medium I. However, men housed in the chapel use the bathroom in the Catawba West unit, separated from the men not in isolation only by a partial wall. An orderly who lives in the Catawba West unit is assigned to clean the bathroom after men in the chapel use it. Men who are isolated in the chapel are also able to interact with men from other units during recreation time.

- The chapel has been simultaneously used for both quarantine for people awaiting release and isolation for people who test positive for COVID-19. People newly assigned to the chapel are not kept separate from people who are already in the chapel. Distancing is not enforced, and men sleep on cots in an open room.

284. Additionally, the lack of adequate medical monitoring of people in isolation places people at risk. In the first few weeks after the housing units in Butner Low were divided into positive and negative units, Defendants did not conduct any temperature checks or screen for symptoms in the positive units. Toward the end of June, medical staff started walking through the units asking if people had symptoms. In the minimum-security camp at Butner I, even those who reported symptoms did not receive medical attention.

285. Finally, the poor conditions and lack of care in isolation units discourage people from reporting their symptoms.

286. In some parts of Butner, Defendants use the SHU for isolation of incarcerated people with COVID-19 symptoms. This is dangerous because the SHU is often used punitively, so some people try to hide their symptoms from staff because they fear being sent to the SHU.

287. Roger Duane Goodwin was moved to the SHU after testing positive. He reported being confined to a cell with dirty floors and no hot water, without toiletries, necessary medications, or even a cup to drink from for the first few days. He was not given any specific instructions or COVID-19 medical treatment. Despite feeling better after only a few days of isolation, he was confined in the SHU for 17 days. He was not re-tested, and states that he does not know how the officials at Butner determined when he should be released back to his housing unit.

288. Sick men at Butner are also afraid to be sent to the SHU because they are afraid they could become sicker without anyone noticing in time to help them. Some of these men hide their symptoms, making it more likely that the virus will spread. Defendants have been aware of this issue since March,[158] but have not changed the conditions to encourage sick people to self-report their symptoms.

**5.** **Defendants have failed to eliminate contact between people in different housing units, thereby facilitating the spread of the virus between housing units.**

289. Defendants have not eliminated contact between people in different housing units.

290. Staff move between housing units, often without wearing masks.

291. Incarcerated people go to work in their jobs in the kitchen, where they interact with people from other housing units and prepare food for people in each of the housing units. On or

---

[158] Declaration of Mary Strassel; *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 37-11 at ¶ 33.

about May 13, two people working in the kitchen had a fever and were taken from the kitchen to the isolation units.

292. Some incarcerated people have jobs requiring them to clean the areas used by people believed to have COVID-19. They then return to their own housing units.

293. Some doors between units are unlocked, and incarcerated people may move freely between the units. In the Camp, a door is left unlocked between a unit housing people who had tested positive for the virus and an adjacent unit housing people who had tested negative, and residents move between the two units.

294. In the Low facility, while the facility was divided into COVID-19-positive and negative housing units, medical staff moved from unit to unit for pill call, stopping to distribute pills in both positive units and COVID-19-negative units. Additionally, staff failed to take care in assigning people who have been exposed to COVID-19 to the appropriate housing unit, allowing them to come into close contact with people in negative units.

295. In recent weeks, people have begun interacting even more with people from other housing units. People are returning to their jobs. People are going to the chow hall to get meals. The recreation yards are open more frequently.

296. Defendants' decision to require staff and incarcerated people to move between housing units or interact with people from other housing units increases the likelihood that the virus will spread from housing unit to housing unit.

## 6. Defendants have failed to take even the most basic measures to prevent the spread of the virus.

297. Defendants have not ensured adequate cleaning or disinfecting of living spaces and common-use equipment, such as bathroom facilities, phones, and computers. According to CDC guidelines, to prevent the spread of COVID-19, "surfaces and objects that are

- 70 -

frequently touched," such as "doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment," should be cleaned and disinfected "several times a day."[159]  Defendants recognized the importance of disinfecting, as shown by their sanitation schedule.[160]  However, despite the clear guidance from the CDC, and contrary to their schedule, Defendants fail to clean and disinfect Butner adequately.  Bathrooms used by more than 100 people are cleaned only once a day. Phones, computers, and tables are cleaned, at most, twice a day.  In the meantime, scores of men in a housing unit touch the surfaces in the bathrooms, and on the phones and computers—one after another.  Other high-touch surfaces, such as the ice machine and hot water dispensers, are rarely if ever cleaned.  At the FMC, a medical facility where many of the most vulnerable people in the BOP are housed, days or even weeks go by between cleanings.[161]

298.  Additionally, Defendants have been aware since March that the cleaning solution they are using to disinfect must be allowed to sit on a surface for ten minutes prior to being wiped off.[162]  They did not make any efforts to inform incarcerated people, who do most of the cleaning, of this requirement until approximately August 10.  Further, staff supervising the cleaning of the facility have not ensured that the cleaning solution is left on for ten minutes. To the contrary, the cleaning solution is generally sprayed on and immediately wiped off.

---

[159]  *Interim Guidance.*

[160]  March 17, 2020 Memorandum for All FCC Staff Regarding Cleaning and Disinfection of Daily Equipment, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 40-3.

[161]  FMC COVID-19 Preventative Measures/Sanitation Tracking Sheet, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 40-4.

[162]  March 17, 2020 Memorandum for All FCC Staff Regarding Cleaning and Disinfection of Daily Equipment, *Hallinan v. Scarantino*, 5:20-hc-02088-FL (June 3, 2020), ECF 40-3 at 3.

299. Defendants also do not enforce mask use by staff. They sporadically enforce mask use by incarcerated people. Defendants' lax mask use enforcement increases the likelihood that staff will spread the virus.

### 7. Other courts have recognized the dire COVID-19 conditions at Butner

300. Earlier this year, in *U.S. v. El-Hanafi*, the Southern District of New York recognized the problems with housing conditions, the lack of disinfectants, and failure to provide personal protective equipment at Butner. The court went so far as to say that it was "difficult to conceive of an environment more conducive to the rapid spread of infection than the type of prison dormitory" at Butner. No. 1:10-cr-00162-KMW, Dkt. 252 (S.D.N.Y. May 19, 2020); *see also Miller v. United States,* No. CR 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (compassionate release granted involving prisoner at Butner due to COVID-19 concerns); *United States v. Dunlap*, 2020 WL 2062311 (M.D.N.C. Apr. 29, 2020) (same); *United States v. Krokos*, No. 12-cr-00527, Dkt. 1016 (C.D. Cal. May 1, 2020) (same); *United States v. Thompson*, No. 15 CR 00448, Dkt. 80 (N.D. Ill. Apr. 17, 2020) (same); *United States v. Saladrigas*, 2020 WL 4248676 (E.D. Mich. May 13, 2020) (same); *United States v. Rachal*, 2020 WL 3545473 (D. Mass. June 30, 2020) (same); *United States v. Howard*, 2020 WL 2200855 (E.D.N.C. May 6, 2020)(same); *United States v. Heitman*, 2020 WL 3163188 (N.D. Tex. June 12, 2020) (same); *United States v. Perez Alvarado*, 2020 WL 5203386 (S.D. Cal. Sept. 1, 2020) (same); *United States v. Hardnett*, 2020 WL 5074023 (E.D. Va. Aug. 27, 2020) (same); *United States v. Black*, 2020 WL 4583056 (S.D. Ind. Aug. 10, 2020) (same); *United States v. Hamrick,* 2020 WL 4548308 (M.D.N.C. Aug. 6, 2020) (same); *United States v. Luna*, 2020 WL 4696621 (N.D. Cal. Aug. 13, 2020) (same); *United States v. Archer*, 2020 WL 4059694 (D. Nev. July 20, 2020) (same); *United States v. Smith*, 2020 WL 2844222 (N.D. Iowa June 1, 2020) (same); *United States v. Camacho*, 2020 WL

4498796 (W.D. La. Aug. 4, 2020) (same); *United States v. Weems*, 2020 WL 4558381 (S.D. Fla. Aug. 7, 2020) (same); *United States v. Ireland*, 2020 WL 4050245 (E.D. Mich. July 20, 2020) (same); *United States v. Ranck*, 2020 WL 4193487 (S.D. Iowa July 9, 2020) (same); *United States v. Griggs*, 2020 WL 2614867 (D.S.C. May 22, 2020) (same); *United States v. Malone*, 2020 WL 3065905 (W.D. La. June 9, 2020) (same); *United States v. Scparta*, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) (expressing particular concern about quarantine because "many inmates who are on the cusp of relief to home confinement to protect them from COVID-19, which is spreading rampantly at FCI Butner, are housed together in closed quarters for at least 14 days").

## VI.  BOP's Policies, Practices, and Procedures to Prevent and Mitigate COVID-19 Violate the Rehab Act

301.  Defendants' actions and inactions in response to the COVID-19 pandemic constitute disability discrimination.  Defendants have discriminated against people with disabilities by failing to make reasonable accommodations and by implementing facially neutral policies that affect people with disabilities more harshly than those without disabilities.

302.  Apart from age, BMI, and a history of smoking, all conditions that increase risk for COVID-19 complications or death—including but not limited to lung conditions, asthma, heart conditions, diabetes, kidney disease, liver disease, HIV, immune dysfunction, autoimmune disorders, cancer treatment, and history of organ or bone marrow transplantation—are disabilities under federal disability rights law.

303.  Incarcerated people at Butner who have any of these conditions are medically vulnerable people with disabilities protected by the Rehab Act in addition to being protected by the constitutional provisions that protect all incarcerated people who are medically vulnerable

to COVID-19 complications or death.  By continuing to detain members of the Disability Subclass, Defendants' policies and practices violate the Rehab Act.

304.    The Rehab Act imposes an affirmative obligation on all covered entities to ensure that their policies, practices, and procedures are accessible to people with disabilities, including providing reasonable modifications in order to give people with disabilities an equal opportunity to benefit from the covered entity's programs, services, and activities.[163]  BOP is a covered entity under the Rehab Act.  Butner has failed to make modifications to ensure that individuals with disabilities can benefit from Butner's programs, services, and activities on an equal basis as people without disabilities who are incarcerated at Butner.  To access programs, services, and activities at Butner, people with disabilities are required to place themselves at a higher risk of suffering serious medical harm or death as a result of contracting COVID-19 than people without disabilities.   Further, Defendants have discriminated against people with disabilities by managing Butner in a manner that affects persons with disabilities more harshly than those who do not.   Indeed, every single incarcerated person who died at Butner from COVID-19 had one or more "long-term, pre-existing medical condition[s], which the CDC lists as risk factors for developing more severe COVID-19 disease."[164]  The vast majority of those pre-existing medical conditions, in turn, constitute a disability under the Rehab Act.  In short, every single incarcerated person who has died from COVID-19 appears to have had a disability.

305.    Incarcerated persons have a right to healthcare, which includes the provision of medication.  As described above, in order to receive medication, people incarcerated at Butner must stand

---

[163] *A Guide to Disability Rights Laws*, U.S. Dep't of Justice: Civil Rights Division (Feb. 2020), https://www.ada.gov/cguide htm (last visited Oct. 19, 2020) ("[Public entities] are required to make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination.").

[164] *See* Ex. 5 (U.S. Dept. of Justice, Fed. Bureau of Prisons Press Releases on Inmate Deaths at FCC Butner).

in a pill line, where it is impossible to physically distance. Because of their disability, Plaintiffs with disabilities face a greater risk of suffering serious symptoms from COVID-19 and requiring hospitalization or death than do other people at Butner. Defendants have not made modifications to reduce the risk to incarcerated people with disabilities to enable them to enjoy the benefits of healthcare on an equal basis with those who do not have disabilities. Further, the method of administration of the provision of medication disparately impacts people with disabilities, as it puts them at higher risk of death than those without disabilities.

306. Incarcerated persons have a right to food. Yet people with disabilities incarcerated at Butner, including Plaintiffs with disabilities, cannot receive meals without facing a greater risk of serious medical harm or death from COVID-19 than people without disabilities. Defendants have not made modifications to reduce the risk to incarcerated people with disabilities to enable them to enjoy the benefits of food on an equal basis with those who do not have disabilities. Further, the method of administration of the provision of food disparately impacts people with disabilities, as it puts them at higher risk of death than those without disabilities.

307. Incarcerated persons have a right to housing. Yet people with disabilities incarcerated at Butner, including Plaintiffs with disabilities, cannot live in their assigned housing without facing a greater risk of serious medical harm or death from COVID-19 than people without disabilities. Defendants have not made modifications to reduce the risk to incarcerated people with disabilities to enable them to enjoy the benefits of housing on an equal basis with those who do not have disabilities. Further, the method of administration of housing

arrangements disparately impacts people with disabilities, as it puts them at higher risk of death than those without disabilities.

308. The Rehab Act also prohibits covered entities from using methods of administration that defeat or impair the accomplishment of the objectives of the covered entity's program. BOP's purpose, by law, is to provide safety, care, and protection for individuals in its custody.[165]

309. All Plaintiffs, including those with disabilities, have a right to safekeeping, care, and protection while in BOP's custody. Continued confinement and BOP's inadequate policies, practices, and procedures regarding COVID-19, which allow mass infection, physical harm, and death, are disproportionately affecting Plaintiffs with disabilities. Butner has failed to establish methods of administration that protect individuals with disabilities from discrimination.

310. As a result of BOP's failures to make reasonable modifications, including release, and its failure to establish a non-discriminatory method of administering its program, individuals with disabilities are being denied the benefits of BOP's safety, care, and protection program and are being disparately impacted by the rapid spread of COVID-19 throughout Butner.

311. The modifications sought are reasonable and would impose no fundamental alteration on BOP.

**VII. BOP's Lack of Adequate Prevention and Mitigation Measures at Butner also Pose a Serious Risk to Public Safety**

312. Butner's conditions affect the broader community and those incarcerated there.

---

[165]  18 U.S.C. §§ 4042(a)(2)-(3).

313. Prison staff interact routinely and frequently with the people incarcerated at Butner. As stated above, at least 80 staff members at Butner have reported to BOP a positive test for the virus. But because Defendants do not test staff, the real number of infected staff is unknown.

314. Defendants' failure to implement meaningful precautionary and mitigating efforts put the health and lives of Butner staff at just as grave a risk as the incarcerated people.

315. More than 1,400 people work at Butner.[166] Some of the employees may themselves be medically vulnerable. And every one of them presumably returns home to the Granville County area or greater Raleigh-Durham area after their shift ends.

316. Doubtless many of the Butner employees live with one or more family members or roommates, some of whom may be medically vulnerable. And, unless the Butner employees have managed to completely isolate themselves from contact with any person outside of the prison, they come into contact with other members of their communities.[167]

317. Moreover, every single person incarcerated at Butner who has died from COVID-19 did so at a nearby hospital.[168] People at Butner will continue to need to go to outside hospitals for care as long as COVID-19 spreads through the prison.

## VIII. Immediate Release of Eligible People Is Necessary to Save Lives

318. More than 1,000 people at Butner have already been infected with COVID-19. Twenty-six incarcerated people have already died, at least one of whom contracted COVID-19 a second time after previously testing positive and recovering, according to BOP.[169]

---

[166] *See PREA Audit Report* (indicating 1,475 staff at FCC Butner).

[167] *See, e.g.*, Beyrer Decl. at 10–11, 13.

[168] *See, e.g.*, Press Release, *Inmate Death at FCI Butner I*, U.S. Dep't of Justice Federal Bureau of Prisons (Apr. 13, 2020), https://www.bop.gov/resources/news/pdfs/20200413_3_press_release_butner.pdf ("John Doe, went into respiratory failure at the Federal Correctional Institution (FCI) Butner I . . . . He was evaluated by institutional medical staff and transported to a local hospital for further treatment and evaluation.").

[169] *See* Press Release, *Inmate Death at FCI Butner (Low)*, U.S. Dep't of Justice Federal Bureau of Prisons (Sept. 17, 2020), https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf ("On Monday, June 1, 2020, inmate Ricky Lynn Miller tested positive for COVID-19. On Monday, July 6, 2020, Mr. Miller tested negative for

319. The population is medically vulnerable. The complex is overcrowded, exacerbating the already inherent difficulty in practicing effective physical distancing.

320. BOP's failures in screening, testing, quarantining, and isolating people—as well its failures in providing regular, adequate access to hygiene and disinfecting products, enabling effective physical distancing, and enforcing mask use policies—will certainly lead to even more infections and deaths.[170] This is especially true of those who are over 50 and/or medically vulnerable.[171]

321. The immediate release of medically vulnerable people incarcerated at Butner will undoubtedly save lives.[172] It is the sole effective remedy for the ongoing Constitutional violations described herein.

322. Reducing the population at Butner will give other mitigation strategies the greatest chance of success by allowing for more effective physical distancing and by allowing BOP to more closely focus its health and safety resources and planning on those remaining in custody.

### CLASS ACTION ALLEGATIONS

323. Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

324. Plaintiffs seek to represent a class of persons currently or in the future incarcerated at FCC Butner while anyone on the premises is infected with COVID-19 (the "Class"). Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip are representatives of the Class.

---

COVID-19 . . . . On Wednesday, September 16, 2020, Mr. Miller tested positive for COVID-19 at the outside hospital. On Thursday, September 17, 2020, Mr. Miller . . . was pronounced dead by hospital staff.")

[170] *See, e.g.*, *id*.

[171] *See, e.g.*, Beyrer Decl. at 9, 10, 12.

[172] *See, e.g.*, Beyrer Decl. at 12–14.

325. The Class also includes a Disability Subclass, consisting of current and future people incarcerated at Butner who are medically vulnerable and at high risk of severe illness or death from COVID-19 due to disabilities protected under Section 504 of the Rehabilitation Act, including those with the following conditions: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") or moderate to severe asthma; immunocompromised state from solid organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other immune weakening medicines; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; diabetes; cerebrovascular disease; cystic fibrosis; hypertension; neurologic conditions such as dementia; liver disease; pulmonary fibrosis; and thalassemia. The Disability Subclass includes those who suffer from pre-existing medical conditions that the CDC has identified as placing a person at a heightened risk of suffering complications from COVID-19.

326. This action has been brought and may properly be maintained as a class action under federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

327. Joinder is impracticable because (i) the Class and Disability Subclass are numerous, (ii) the Class and Disability Subclass include future members, and (iii) the Class and Disability Subclass members are incarcerated, limiting their ability to institute individual lawsuits.

328. Everyone in Butner is a member of the proposed Class.[173]  There are more than 3,900 members of the proposed Class.

---

[173] *See Population Statistics: Inmate Population Breakdown.*

329. There are more than 200 people in the proposed Disability Subclass.  On the fourth floor of FMC Butner alone, there are around 200 people who are immunocompromised due to cancer treatment.

330. Common questions of law and fact exist as to all members of the proposed Class and Disability Subclass, namely whether:

- All are at unreasonable risk of serious harm, including death, from contracting coronavirus due to the conditions in Butner;

- All are at unreasonable risk of serious harm, including death, from Defendants' failure to take reasonable and proactive measures to ensure their safety from the disease;

- All have a right to adequate COVID-19 prevention, testing, and treatment;

- Defendants have been deliberately indifferent to the risk of harm to the Class from COVID-19; and

- The conditions in Butner expose them to heightened risk of contracting COVID-19.

331. Common questions for all members of the Disability Subclass include whether Butner's policies, practices, and procedures with respect to COVID-19 discriminate against people with disabilities in violation of federal disability rights laws and whether Defendants have failed to make reasonable modifications for the Disability Subclass as alleged in this Complaint.

332. Plaintiffs' claims are typical of the Class and the Subclass members' claims.  Defendants have placed Plaintiffs at significant risk of harm by failing to take appropriate steps to address the risk of contracting, and being rendered seriously ill or injured by, COVID-19 in Butner.  Plaintiffs, like every person in Butner, face heightened risk of contracting the virus if they are not adequately protected by Defendants.  Plaintiffs with disabilities, like all

- 80 -

members of the proposed Disability Subclass, face a heightened risk of serious illness or death if they contract COVID-19.

333. Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse to the interests of the proposed Class. Plaintiffs retained pro bono counsel with experience and success in the prosecution of civil rights litigation and specifically in the prosecution of prisoners' civil rights litigation. Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

334. Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief. Plaintiffs therefore seek class certification under Rule 23(b)(2).

### FIRST CAUSE OF ACTION

**Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act of 1973**
*Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman,*
*Butler, Williams, and Waldrip versus Defendant BOP*
*29 U.S.C. § 794 et seq.*

335. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

336. Section 504 of the Rehab Act states that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The regulations implementing Section 504 of the Rehab Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

- 81 -

337. Section 504 forbids not only facial discrimination against individuals with disabilities, but also requires that executive agencies such as BOP alter their policies and practices to prevent discrimination on the basis of disability. Reasonable modifications are required unless those modifications would create a "fundamental alteration" of the relevant program, service, or activity, or would impose an undue hardship. *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 n.17 (1987); *Alexander v. Choate*, 469 U.S. 287, 300 (1985); *see also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

338. Defendants are final policymakers for, or in the case of Defendant BOP is itself, an executive agency within the meaning of 29 U.S.C. § 794(a).

339. Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip are individuals with disabilities for the purposes of the Rehab Act, 42 U.S.C. § 12012, 29 U.S.C. § 705(20)(B). As people held at Butner, they are "qualified" for the programs, services, and activities being challenged herein.

340. Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip bring this claim on their own behalf and on behalf of the Disability Subclass.

341. Defendants are violating section 504 of the Rehab Act by failing to make the reasonable modifications necessary to ensure equal access to programs, services, and activities for people with disabilities who face high risk of complications or death in the event of COVID-19 infection.

342. Plaintiffs at Butner are under the custody and control of Defendants and are not able to take steps to protect themselves from the spread of the virus. BOP has a duty to provide safety, care, and protection to Plaintiffs, including those with disabilities. Defendants have not provided reasonable accommodations. As COVID-19 continues to spread at Butner, the already deplorable conditions at Butner are only exacerbated further.

343. Defendants are aware that exposure to COVID-19 could be harmful or deadly to Plaintiffs who are members of the Disability Subclass and have failed to protect them.

344. Defendants have failed to provide reasonable accommodations, including the release of persons with disabilities, to mitigate these significant risks, which continuously subject Plaintiffs to a grave and serious risk of harm from serious illness, permanent injury, or death.

345. Defendants have also enacted policies and procedures that deny Plaintiffs access to necessary medical care, which further subject Plaintiffs to a grave and serious risk of harm from serious illness, permanent injury, or death.

346. Defendants' failure to protect Plaintiffs with disabilities from these conditions by releasing prisoners and otherwise taking additional measures to ensure they are not forced to take on greater risk of serious injury or death than other people incarcerated at Butner to access programs, services, and benefits constitutes discrimination under Section 504 of the Rehab Act.

347. Defendants are further violating section 504 of the Rehab Act by employing methods of administration of Butner (including a policy of non-release even in the face of COVID-19) that discriminate against people with disabilities by falling more harshly on people with disabilities than on people without disabilities. Twenty-six incarcerated people have died at Butner from COVID-19; each of them—according to the BOP press releases—had one or

more pre-existing medical conditions that placed them at heightened risk of suffering complications from COVID-19. The vast majority of those conditions, in turn, constitute disabilities under the Rehab Act. Therefore, Plaintiffs believe that no incarcerated people without disabilities have died from COVID-19 at Butner.

348. Section 504 forbids not only facial discrimination against individuals with disabilities, but also any policies or practices that have a disparate impact on disabled individuals. *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 542 (D. Md. 2020). "[A] facially neutral practice may be discriminatory if it 'fall[s] more harshly on one group than another.'" *Id*.

349. Defendants have enacted policies and procedures that have a disparate impact on the Disability Subclass by subjecting them to a much higher risk of, and rate of, death from COVID-19 than persons incarcerated at Butner who do not have disabilities.

350. Defendants' failure to protect Plaintiffs with disabilities from these conditions by releasing prisoners and otherwise taking additional measures to ensure they are not disparately impacted by the policies and practices at Butner constitutes discrimination under Section 504 of the Rehab Act.

### SECOND CAUSE OF ACTION

**Unconstitutional Conditions of Confinement in Violation of
the Eighth Amendment to the U.S. Constitution
*All Named Plaintiffs versus All Defendants*
*28 U.S.C. § 1331***

351. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

352. Plaintiffs Hallinan, Kinard, Riddick, Maldonado, Brown, Freeman, Butler, Williams, Jackson, and Waldrip bring this claim on their own behalf and on behalf of the Class.

- 84 -

353. The Eighth Amendment guarantees incarcerated persons the right to necessary and adequate medical care, and to be free from cruel and unusual punishment. *See* U.S. Const., amend. VIII. As part of the right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

354. Plaintiffs at Butner are under the custody and control of Defendants and are not able to take steps to protect themselves from the spread of the virus. Defendants have not provided adequate protections. As COVID-19 continues to spread at Butner, the already deplorable conditions at Butner are only exacerbated further.

355. Defendants are aware of these conditions, which were and are obvious throughout Butner.

356. Defendants know of and have disregarded an excessive risk to health and safety.

357. Defendants have failed to take reasonable steps, including the release of medically vulnerable persons, to mitigate these significant risks, which continuously subject Plaintiffs to a substantial risk of harm from serious illness, permanent injury, or death.

358. Defendants have also failed to provide adequate medical care and have taken affirmative steps to deny Plaintiffs access to necessary medical care, which further subjects Plaintiffs to a substantial risk of harm from serious illness, permanent injury, or death.

359. Defendants' failure to protect Plaintiffs from these conditions by releasing prisoners and otherwise remedying the conditions of confinement constitutes deliberate indifference to the health, safety, and serious medical needs of Plaintiffs and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

360. Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### THIRD CAUSE OF ACTION

**Unconstitutional Confinement in Violation of
the Eighth Amendment to the U.S. Constitution
*Plaintiffs Hallinan, Kinard, Riddick, Maldonado, Brown, Freeman, Butler, Williams,
Jackson, and Waldrip versus Defendants Scarantino and Carvajal*
*28 U.S.C. § 2241 (Habeas Corpus)***

361. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

362. Plaintiffs Hallinan, Kinard, Riddick, Maldonado, Brown, Freeman, Butler, Williams, Jackson, and Waldrip bring this claim on their own behalf and on behalf of the Class.

363. The Eighth Amendment guarantees incarcerated persons who have been sentenced the right to necessary and adequate medical care, and to be free from cruel and unusual punishment. *See* U.S. Const., amend. VIII. As part of the right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety. *See, e.g.*, *Farmer*, 511 U.S. at 828; *Estelle*, 429 U.S. at 104.

364. Plaintiffs at Butner are under the custody and control of Defendants and are not able to take steps to protect themselves—such as physical distancing and avoiding high-touch surfaces— and Defendants have not provided adequate protections from the risk of harm from COVID-19. As COVID-19 continues to rapidly spread at Butner, the incarcerated men have no adequate ability to protect themselves from this disease.

365. Defendants are aware that the Plaintiffs are confined at Butner and cannot avoid the spread of COVID-19 due to their confinement.

366. Defendants know of and have disregarded excessive risks to Plaintiffs' health and safety.

367. Defendants have failed to take reasonable steps to mitigate these significant risks, which continuously subject Plaintiffs to a substantial risk of harm from serious illness, permanent injury, and death.

368. Defendants have also failed to provide adequate medical care and taken affirmative steps to deny Plaintiffs access to necessary medical care, which further subject Plaintiffs to a substantial risk of harm from serious illness, permanent injury, or death.

369. Defendants' failure to take reasonable steps to protect Plaintiffs from these conditions by releasing them from the conditions altogether constitutes deliberate indifference to the health, safety, and serious medical needs of Plaintiffs and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs and the Class members respectfully request that the Court order the following relief:

A. Enter a declaratory judgment that Butner's policies and practices violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class and Disability Subclass;

B. Enter a declaratory judgment that Butner's policies and practices violate Section 504 of the Rehab Act with respect to the Disability Subclass;

C. Order Defendants to create and implement a mitigation plan for prevention of COVID-19 that is consistent with CDC guidelines, overseen by a qualified public health expert, and provides appropriate and reasonable accommodations to those with disabilities.

D. Order the Defendants to provide all necessary and appropriate health care consistent to ensure that health care needs of individuals incarcerated at FCC Butner are being met, including continued attention to non-COVID-19 related medical needs.

E. Establish a process to identify all incarcerated persons who are appropriate for release on home confinement, furlough or other release mechanisms, and order and/or grant a writ of habeas corpus requiring Defendants to release, without quarantining at Butner, all persons identified through that process as appropriate for release;

F. Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, the Rehab Act, and any other applicable laws; and

G. Any further relief that this Court deems just, necessary, or appropriate.

Respectfully submitted this 26th day of October, 2020.

/s/ Jeffrey S. Wilkerson
Jeffrey S. Wilkerson [N.C. State Bar No. 51209]
Gretchen Scavo [N.C. State Bar No. 48589]*
Elizabeth Ireland [N.C. State Bar No. 47059]*
Patrick Doerr [N.C. State Bar No. 50673]*
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com
gscavo@winston.com
eireland@winston.com
pdoerr@winston.com

Maria V. Morris[†]
[N.Y. State Bar No. 4091435]
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, DC 20005
Tel.: (202) 548-6607
mmorris@aclu.org

Sarah Hinger[†]
[N.Y. State Bar No. 4823878][†]
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org

Jonathan M. Smith [D.C. Bar No. 396578][†]
Jacqueline Kutnik-Bauder [Mo. Bar No. 45014] [†]
Mirela Missova [D.C. Bar No. 1024571] [†]
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS

Emily E. Seawell [N.C. Bar No. 50207]
Jaclyn Maffetore [N.C. Bar No. 50849]
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA
LEGAL FOUNDATION

700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
Fax: (202) 319-1010
jonathan_smith@washlaw.org
jacqueline_kutnik-bauder@washlaw.org.

Post Office Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
Fax: (866) 511-1344
eseawell@acluofnc.org
jmaffetore@acluofnc.org

\* Admission Forthcoming
† Special Appearance Forthcoming

*Counsel for Plaintiffs/Petitioners*